In re ESTATE OF Troy
G. BLACKBURN.

Troy Blackburn and Bobbie Ellis, as
Co–Administrators of the Estate of
Troy G. Blackburn, Decedent

v.

Herbert Fred Blackburn.

Court of Appeals of Tennessee,
Western Section, at Nashville.

May 31, 2007 Session.

Nov. 14, 2007.

Permission to Appeal Denied by
Supreme Court April 7, 2008.

Robert L. Huskey, Manchester, Tennessee, for the appellant, Herbert Fred Blackburn.

J. Stanley Rogers and Christina Henley Duncan, Manchester, Tennessee, for the appellees, Troy Blackburn and Bobbie Ellis, as Co–Administrators for the Estate of Troy G. Blackburn, Decedent.

## OPINION

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, J., and DONALD P. HARRIS, SR. J., joined.

This is a will contest. The decedent, who had three grown children, died after a

long illness. Two of his children filed a petition to administer the decedent's intestate estate as co-administrators. During the ensuing two years, the third child lived part-time in the decedent's home. When it was discovered that some personal property in the decedent's home was missing, the co-administrators filed a petition against their sibling to recover it as property of the estate. The third child filed a counterclaim, seeking to probate as the decedent's last will and testament a handwritten document that was drafted and executed about eight hours before the decedent's death. The co-administrators contested the purported will. After a jury trial, the jury returned a verdict finding that the handwritten document was "not a will." The trial court entered judgment on the verdict. The will proponent now appeals. We affirm, concluding that the validity of the will was a fact question for the jury, that the trial court did not abuse its discretion on the evidentiary issues presented, and that the jury's verdict is supported by material evidence.

Decedent Troy G. Blackburn ("Decedent") was a widower. He had three grown children, Petitioners/Appellees Troy "Terry" Blackburn ("Terry"), Bobbie Ellis ("Bobbie"), and Respondent/Appellant Herbert Fred Blackburn ("Freddy"). The Decedent lived in a home on approximately forty-eight acres in Coffee County, Tennessee. He owned an excavating business called "Troy Blackburn and Son Excavating;" son Terry worked in this business with his father for several years.

About a year before his death, the Decedent was diagnosed with cancer. As his health deteriorated, he was hospitalized. After a time, the Decedent was discharged to his home, where he received hospice care. Freddy lived with the Decedent for a period of time before his death, but also maintained an independent residence at 1476 Mt. View Road.

On September 20, 2002, the day before he died, the Decedent was visited at various times by all three of his children. Around 5:00 p.m. that evening, while Freddy was present and Terry and Bobbie were away, the Decedent wrote the following on a piece of paper: "Freddy can do what ever he (Freddy) wants to with everything after I pass." The Decedent signed and dated the paper, and his signature was witnessed by the Decedent's friends, Timothy Grosch and Barbara Lowery.

Later that evening, Freddy mentioned the handwritten document to Terry and Bobbie referring to it as their father's will. However, neither Terry nor Bobbie read the document at that time. Around 1:00 a.m. the next morning, on September 21, 2002, the Decedent died. At his death, the Decedent owned his residence in Coffee County, valued at $96,800, two checking accounts worth about $23,932, and other personal property.

After the Decedent's death, Terry and Bobbie went to their father's home to inventory his valuables. They found the home in disarray and the Decedent's wall safe unlocked, open, and empty. Terry and Bobbie knew that Freddy had possession of their father's wallet, which contained the combination to the safe, and that the contents of the safe had included heirloom jewelry, guns, and a considerable amount of cash.

Terry and Bobbie asked Freddy to give them the document their father had written the night before he died, which Freddy had referred to as the Decedent's will, for purposes of probating their father's estate. Freddy refused to do so. On October 2, 2002, Terry and Bobbie petitioned the trial court to be co-administrators of the Decedent's intestate estate. By letter dated

November 26, 2002, counsel for Terry and Bobbie wrote Freddy a letter demanding that he cease and desist using the Decedent's property as his own, and seeking information on the whereabouts of the contents of the Decedent's wall safe. The letter informed Freddy that, if the parties could not agree on a division of the Decedent's property, then the property would be sold and the proceeds divided.

A year and a half later, on April 30, 2004, Terry and Bobbie, as co-administrators of the Decedent's estate, filed a lawsuit against Freddy to recover over $40,000 worth of personal property belonging to the estate. On August 9, 2004, Freddy filed an answer to the complaint, as well as a counterclaim seeking to probate the handwritten paper signed on September 20, 2002, as their father's last will and testament. On September 8, 2004, Terry and Bobbie (collectively, "Plaintiffs") filed a complaint to contest the will proffered by Freddy ("Defendant").

On March 8, 2005, a jury trial was held, Judge Jerry Scott presiding. During the course of the trial, the original document purporting to be the Decedent's last will and testament was made a part of the record. However, when court reopened after a lunch recess, the document was missing. A copy of the document had been filed with the court clerk's office, so the trial proceeded with the copy. Later in the day, it was disclosed that at least two jurors had reported that they had seen Freddy fold up the original document and take it with him when he left the witness stand prior to lunch. At that point, Judge Scott declared a mistrial.

After the mistrial was declared, Terry and Bobbie filed another motion to dismiss Freddy's petition or to prohibit the use of the copy of the will in place of the original. Freddy then filed a motion for summary judgment as to the validity of the will,

attaching to his motion an affidavit, the previous trial testimony of witnesses to the will, and a statement of undisputed facts. Freddy also filed a motion to exclude the testimony of the jurors who claimed that they saw him take the original will document from the witness stand during the first trial. On September 26, 2005, the trial court denied the Plaintiffs' motion to dismiss or to prohibit use of the copy of the purported will. It also denied Freddy's motion for summary judgment and his motion to exclude the testimony of the jurors who observed him taking the will from the witness stand. Thereafter, Freddy filed a motion asking Judge Scott to recuse himself from the case, based on comments Judge Scott made in connection with the missing will document. The motion to recuse was granted.

At that point, Judge L. Craig Johnson, who had returned from military service, began presiding over the case. The parties filed renewed motions, asking Judge Johnson to reconsider Judge Scott's denial of their motions. On March 7, 2006, Judge Johnson entered an order declining to reconsider Judge Scott's decisions.

On March 7, 2006, the second jury trial commenced. The jurors heard testimony from Terry, Bobbie, Freddy, and various friends and neighbors of the Decedent.

At the outset, the jurors heard the testimony of Barbara Lowery (Tucker) ("Lowery"), a friend of the Decedent who witnessed his execution of the purported will. Lowery became friends with the Decedent around 1998 and often spoke with him about family matters and other such things. In one conversation, Lowery specifically talked with the Decedent about the manner in which he wished to dispose of his property at his death. Lowery said that the Decedent indicated to her that Terry and Bobbie did not need anything, and that he planned to sell his property

and leave all the money to Freddy. Lowery reported that he told her that he was "just going to leave everything ... I got to Freddy." The Decedent described his family as "tight, close, [and] loving," and he commented that Terry and Bobbie "would [not] mind because Freddy was there for him...." Lowery said that she advised the Decedent that he should put his wishes in writing. When she suggested to the Decedent that he not leave his property to only one of his children, the Decedent explained that Freddy would "keep it in the family" and perhaps continue to operate the family business. She said that the Decedent did not seem to be under the influence of Freddy or anyone else when he made these statements.

When asked about Freddy's September 2001 arrest for felony drug possession and sale of controlled substances, Lowery said that the Decedent believed that Coffey County authorities had framed Freddy. The Decedent thought that, if he sold all of his property and gave the proceeds to Freddy, Freddy would be able to use the money to hire a qualified criminal defense attorney.

On the day before the Decedent died, Lowery visited the Decedent when he had just returned home from the hospital. She returned to the house a second time because the Decedent asked her to come and bring her notary stamp and indicated that he was attempting to follow her suggestion that he put his intentions in writing. In accordance with his wishes, Lowery went to the Decedent's home with her notary stamp and a notary form. The Decedent took the notary form, wrote on it, and

signed and dated the document; this became the purported will. Lowery did not read the document at the time, but she was in the room and saw the Decedent sign it. Another friend of the Decedent, Timothy Grosch ("Grosch"), also signed the document as a witness while Lowery was in the room, but she did not see him sign it because she was talking to the Decedent at the time. Lowery signed the document last, as the notary, while the Decedent and Grosch were still in the room.[1] Neither Terry nor Bobbie were present when the document was written and signed. Lowery testified that the purported will was consistent with the Decedent's previously stated wish that all his property be devised to Freddy.

Grosch also testified at the trial. Grosch became acquainted with the Decedent through his friendship with Freddy. Grosch stated that, on the evening the purported will was executed, he arrived at the Decedent's home at about 5 p.m. to pay his last respects. He stayed for about an hour. He was unaware that he would be asked to witness the execution of the purported will. Grosch said that he and the Decedent carried on a normal conversation, and the Decedent "seemed to know everything that was going on...."

That evening, Grosch said, he saw the Decedent sign his name on the document, but did not see him write the body of the document he signed. The Decedent then asked Grosch to "do him a favor" and witness his signature. Grosch signed his name under the Decedent's signature, but he did not otherwise read the document.

1. Lowery wrote on the purported will that her notary expired on November 25, 2002, but she later acknowledged that her notary had actually expired on November 25, 2000. Lowery said that she did not realize at the time she signed the document that her notary stamp had expired. This fact does not alter our analysis, because a will does not have to be notarized, and so the notary certificate has no bearing on the validity of the will. *See Battles v. First Union Bank*, No. 01A01–9809–CH–00497, 1999 WL 675126, at *2–*3 (Tenn. Ct.App. Sept.1, 1999).

Although Grosch had apparently testified in the first trial that Lowery was not in the room when the Decedent signed the document, in this trial, Grosch testified that Lowery was "in and out of the room...." After the purported will was executed, Terry and his wife arrived at the Decedent's house. Grosch stayed and visited with them and Freddy for a while, but did not recall Freddy telling Terry that the Decedent had just signed a document purporting to be his last will and testament.

The jury heard testimony from the Decedent's former neighbor, Randy Laymance, and the Decedent's friend of thirty years, Leroy Uselton. Both testified that the Decedent had told them that he would not want his property sold or divided, that he had had it for a long time, and he wanted it kept all together. Laymance testified that he had no impression that anyone was seeking to influence the Decedent on the disposition of his property. Uselton said that the Decedent seemed alert and aware of what was going on.

Freddy testified at the trial. He said that, about six months before the Decedent passed away, he sought legal counsel, at the request of Terry and Bobbie, to determine what would be required for the Decedent to make a will. Freddy testified that the lawyer told him that, if the Decedent did not have a will and the children could not agree on the disposition of his property, the State would become involved and the property would be sold or divided. Freddy also reported that the lawyer told him that, in order to make a will, the Decedent would need two witnesses and a notary public. If the Decedent did not want to visit the lawyer's office, Freddy was told, the will needed to be written in the Decedent's own handwriting. Freddy said that he conveyed all of this information to the Decedent, and that the Dece-

dent told him that he did not want the State involved, nor did he want his property divided.

Freddy testified that, in attempting to help his father make his will, he had difficulty coordinating the two witnesses and a notary to have all of them at the Decedent's home at the same time. When Grosch visited the Decedent on the day before the Decedent's death, Freddy stated, the Decedent asked Freddy to attempt to find Lowery. Though Freddy was unable to locate Lowery, she happened to visit their house that evening. After the purported will was signed, Freddy said, it was attached by a magnet to the refrigerator door. Freddy said that he offered to show the purported will to Terry and Bobbie that evening, but they did not want to see the document. He asserted, however, that they knew about its existence and that he gave a copy of it to each of them. Freddy kept the original purported will in his possession before he presented it to the trial court.

Freddy lived with the Decedent for some time before his death, but he maintained his independent residence on Mt. View Road. The evidence showed that the attorney for the estate sent letters to Freddy at the Mt. View Road address, the first dated October 2, 2002, advising him about the opening of the estate, and the second dated November 26, 2002, seeking the return of personal property belonging to the estate. Freddy denied receiving those letters, but he admitted that Terry had told him of their content.

Freddy was questioned about the first trial, during which the original purported will was lost. He acknowledged that he handled the document during his testimony at the previous trial, but said that he did not recall folding the document and leaving the witness stand with it, as had been suggested. He maintained that he

did not know what happened to the document.

The Plaintiffs submitted evidence of Freddy's prior conviction for possession with intent to sell marijuana. Freddy maintained that he had never smoked marijuana, and he indicated that the drugs found in his possession belonged to his uncle.

Three jurors from the first trial, Randal Cox ("Cox"), Angela Stacy ("Stacy"), and Glenn Farris ("Farris"), all testified about Freddy's conduct at the first trial, stating that they saw him fold up the purported will after his testimony. Cox said that Freddy put the document in his pocket, and he reported the incident to the bailiff because "it just didn't seem proper." Stacy testified that she saw Freddy return to his seat from the witness stand after he folded up the document, and that she saw him tuck the document under his leg. Farris said that he saw Freddy walk back to his seat after he folded up the document, but he was unsure whether Freddy put the document back in his pocket. As a rebuttal witness, a deputy court clerk, Lorie Faulk, testified that another exhibit from the first trial was also lost, but was later found in the trial judge's papers.

Terry testified at the trial. He described his relationship with his father as a loving, normal relationship and claimed that there was no reason why his father would have left him out of his last will and testament. In 1989, Terry moved from Massachusetts back to Tennessee and started the excavating business with the Decedent called "Troy Blackburn and Son Excavating." Terry invested $14,000 of his own money in the business, which was used for business start-up costs, including purchasing a dump truck and a back hoe. After working full-time in the excavating business for three years, Terry took another job. He continued, however, to work with his father on the weekends until about a year before his father's death.

Terry stated that, on the day before his father's death, he and his wife visited the Decedent's home twice, the first time at around 3:00 p.m., and then again at around 9:00 p.m. During the afternoon visit, Terry and his wife offered to help the Decedent pay some of his bills that had accumulated on a table, but the Decedent declined, telling them that he "couldn't see what he was signing so he wasn't going to sign anything." Terry acknowledged that, at the 3:00 p.m. visit, the Decedent was "alert, aware, and knew what he was doing." When Terry arrived for the second visit around 9:00 p.m., the Decedent's condition had worsened. At some point after Terry arrived, but before the Decedent died, Freddy mentioned to Terry that he had a will executed by the Decedent. Terry told Freddy that it was not an appropriate time to discuss a will, because their father had not yet died. By about 10:30 p.m., the Decedent's hospice caretaker was called to the house, and he passed away at around 1:00 a.m.

Terry said that he had never talked with his father about making a will or about the disposition of his property after his death. He acknowledged, however, that "it was common knowledge that Dad didn't want the place sold...." Terry asserted that, after the Decedent died, he and Bobbie attempted to obtain the purported will from Freddy so they could settle the estate, but Freddy would not come forward with it, and commented that Freddy was "not willing to do anything."

After the Decedent's death, Freddy continued to care for his property, and in fact he was at the property much of the time. Before the petition to administer the estate was filed, Terry and Bobbie suggested to Freddy that they meet at the Decedent's home to remove the Decedent's

valuable items from the house. On approximately October 1, 2002, the parties met at the Decedent's house, supposedly for that purpose. According to Terry, however, at that visit, it was apparent that "someone had already been through everything in the house." He said that the Decedent's safe was unlocked and nothing was in it. The next day, Terry and Bobbie filed a petition to administer the intestate estate.

About a year after the petition to administer the estate was filed, Terry and Bobbie went to the Decedent's home to take an inventory of the remaining personal property of the Decedent. At that time, Freddy was in jail, but Freddy's girlfriend was at the house and she let them in for this purpose.

Bobbie testified as well. Bobbie stated that when she arrived at the Decedent's home on September 20, 2002, at around 7:00 or 7:30 p.m., the Decedent was not responsive. Later in the evening, Freddy showed Bobbie a folded piece of paper and said to her, "I want you to remember this. Look at the clock. It's five minutes until ten. You're going to remember this. This is a will." She said that Freddy never unfolded the piece of paper.

Bobbie testified that, after the Decedent's death, she looked for the Decedent's wedding ring so that he could be buried with it, but she could not find it. She suspected that Freddy had the ring. When Bobbie later spoke with Freddy, he denied having the ring, but acknowledged that he had taken the Decedent's wallet, which contained $1,000 cash. Freddy explained that he used the cash to buy feed for the animals on the farm. Bobbie said that Freddy did not attend the meeting with the funeral director to make arrangements for the Decedent's burial, nor did he attend the family visitation.

About a week after the Decedent's death, Bobbie said, the parties met to discuss the disposition of the Decedent's property. Preliminarily, they agreed that Bobbie would receive the Decedent's house, and that Terry and Freddy would share the land. Bobbie corroborated Terry's testimony that the parties agreed to meet at the Decedent's home to move his valuable property to a safer place. When they arrived at the house, however, everything was in "[t]otal disarray.... Things had been gone through. Stuff was laying everywhere." The Decedent's wall safe was open and empty when they arrived. Bobbie was aware that her father had kept a large amount of cash in the safe. Before the year 2000, the Decedent took a large amount of money out of the bank, because he was afraid that computers would malfunction and the bank would lose its records. The Decedent had planned to purchase some property with the money. When they arrived, all of the cash was gone, along with the other contents of the safe, such as several pieces of heirloom jewelry and a coin collection. Bobbie said she did not know what had happened to the contents of the safe. When she asked Freddy about it, he acted as if he had no information. She noted, however, that Freddy had a key to the Decedent's house and access to the property, and that the combination to the safe had been kept in her father's wallet, which Freddy acknowledged was in his possession. Since her father's death, Bobbie said, she had not had free access to the Decedent's property.

Bobbie testified that, after she and Terry filed the petition to administer the estate, she "begged" Freddy to let her see the purported will, but he refused. When they discussed the letters sent to Freddy from the estate's attorney, Freddy told Bobbie that he did not care what the let-

ters said, because "he was just doing what he was supposed to do."

Bobbie testified that she could think of no reason why her father would cut her out of his will. She said that she and her father had never had differences, and her father was a wonderful man who had helped all of his children when they were in need.

At the conclusion of the trial, the jury was given a special verdict form requiring them to choose one of four options. The form indicated that the first inquiry for the jury was whether the purported will was (1) a formal will, (2) a holographic will, (3) a formal and holographic will, or (4) not a will. After deliberation, the jury chose option (4), finding that the document was "not a will." Pursuant to this finding, the trial court held that the document was not the last will and testament of the Decedent, and it entered a judgment on the verdict in favor of the Plaintiffs. Freddy then filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial court denied that motion. The Defendant now appeals.

The Defendant raises several issues on appeal. He first argues that Judge Scott erred in denying his motion for summary judgment on the validity of the purported will, and that Judge Johnson erred in refusing to reconsider Judge Scott's ruling on this motion. He also argues that the trial court erred in submitting to the jury the issue of whether the written instrument constituted a will, because this was an issue of law for the trial court. He contends as well that the trial court erred in failing to set aside the jury verdict and/or to grant a j.n.o.v. based on undisputed evidence of the Decedent's testamentary intent, his testamentary capacity, and the existence of a will that was entirely in the Decedent's handwriting. In addition, the Defendant raises two evidentiary

issues. First, he argues that the trial court erred in admitting the testimony of the three jurors from the first trial, who testified that he took the original will document during the first trial. Second, he argues that the trial court erred in admitting evidence of his drug use and conviction.

■ We first address the contention that the trial court erred in denying his motion for summary judgment on the validity of the purported will. In this case, after the trial court denied the Defendant's motion for summary judgment, the case proceeded to a trial on the merits. "[T]he denial of summary judgment because of genuine factual disputes is not appealable after a trial on the merits." *Oliver v. Hydro-Vac Servs., Inc.*, 873 S.W.2d 694, 696 (Tenn.Ct.App.1994) (quoting *Martin v. Washmaster Auto Ctr., Inc.*, No. 01–A–01–9305–CV00224, 1993 WL 241315, at *2 (Tenn.Ct.App. July 2, 1993)); *see Hobson v. First State Bank*, 777 S.W.2d 24, 32 (Tenn.Ct.App.1989) ("When the trial court's denial of a motion for summary judgment is predicated upon the existence of a genuine issue as to a material fact, the overruling of that motion is not reviewable on appeal when subsequently there has been a judgment rendered after a trial on the merits."). Therefore, we do not address the propriety of Judge Scott's denial of the Defendant's motion for summary judgment. Likewise, we decline to address Judge Johnson's decision not to reconsider Judge Scott's denial of the summary judgment motion.

■ We next consider the Defendant's contention that the trial court erred in submitting to the jury the issue of whether the written instrument constituted a will, because this was an issue of construction and should have been decided

by the trial court, not the jury.[2] We note that, although "[t]he construction of a will is a question of law for the court . . ., [t]he validity of a will is a question of fact, as determined from all the evidence, intrinsic or extrinsic, as to whether the [testator] intended the writing to operate as a will." *Lee v. Gilliam (In re Estate of Meade),* 156 S.W.3d 841, 843 (Tenn.Ct.App.2004); *see also In re Estate of Eden,* 99 S.W.3d 82, 87 (Tenn.Ct.App.1995). In our view, the first issue to be determined was an issue of validity, i.e., were all of the requirements of a will, formal or holographic, met by this writing. This inquiry did not involve interpretation of the terms in the document. Thus, because the issue was one of validity, not of construction, the trial court properly submitted the issue to the jury for resolution.

■ The Defendant also argues that the trial court committed reversible error in allowing the testimony from the three jurors regarding the Defendant taking the original copy of the purported will at the first trial, and also in allowing evidence regarding his involvement with drugs and his criminal record. He contends that this evidence was not relevant to any material fact at trial, but was intended to unfairly prejudice him by labeling him as a liar and a drug user. The Defendant notes that he did not testify in his case-in-chief, but that the Plaintiffs called him to testify when they presented their proof, primarily in order to get in the unfairly prejudicial evidence. Thus, because any relevance of the evidence was outweighed by its prejudicial effect, the Defendant argues, the trial court should be reversed on these evidentiary rulings and the case remanded

for a new trial. *See* Tenn. R. Evid. 403. In response, the Plaintiffs argue that the challenged evidence was relevant to the Defendant's credibility, and that his testimony was highly relevant because he was the proponent of the purported will, and because he was instrumental in having it drafted and executed. With respect to the evidence of the Defendant's conviction, the Plaintiffs argue that this evidence was admissible pursuant to Rule 609 of the Tennessee Rules of Evidence (Impeachment by Evidence of a Conviction of Crime).

■ Rule 403 of the Tennessee Rules of Evidence states that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Tenn. R. Evid. 403. The trial court has broad discretion to determine whether evidence is relevant and, if so, whether such evidence should, nevertheless, be excluded based on the danger of unfair prejudice, confusion of the issues, or misleading the jury. Such a determination will not be reversed unless the trial court has abused its discretion. *Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439, 442–43 (Tenn.1992).

Here, the Defendant's credibility was relevant to a number of issues surrounding the formation and execution of the purported will. The Defendant was the legal proponent of the purported will, and he was the sole beneficiary named in it. He testified that he consulted an attorney, supposedly at the behest of his siblings, about what the Decedent needed to do in order to make a will. He testified about

---

**2.** The Defendant also argues that the trial court erred in submitting the issue to the jury because the undisputed evidence requires a finding that the document was a valid will. The Defendant did not raise this issue in a motion for a directed verdict at the close of

proof, but did challenge the strength of the proof in his motion for a j.n.o.v. Therefore, we address this issue within the context of our review of the trial court's denial of the motion for a j.n.o.v. *Eaton v. McLain,* 891 S.W.2d 587, 590 (Tenn.1994).

reporting the attorney's advice to the Decedent. By his own admission, the Defendant facilitated the drafting and execution of the will on the eve of the Decedent's death. Had the jury determined that the document was a valid will, it would have been required to address the Plaintiffs' contention that the Defendant unduly influenced his father in connection with the will. The Defendant's testimony was relevant to the testamentary capacity of the Decedent during the relevant time period. In addition, Lowery explained the Decedent's alleged desire to leave all of his property to Freddy in part by stating that the Decedent had said that Freddy could use the monies to fight the drug charges. Thus, the Defendant's credibility was probative to many issues in this case, as was evidence on the drug charges, and we must hold that the trial court did not abuse its discretion in allowing the challenged evidence.

■ Finally, Defendant argues that the trial court erred in denying his motion for a judgment notwithstanding the verdict and in entering a judgment on the verdict, because no material evidence supported the jury's verdict, and the verdict was the result of the inflammatory and inappropriate evidence about Defendant's criminal record and his alleged taking of the will document during the first trial. We have determined that the admission of evidence regarding the Defendant's conduct in the first trial and his involvement with drugs was not inappropriate. At this juncture, we must determine whether, in light of all the evidence, the trial court acted properly in denying the motion for a j.n.o.v. and in approving the jury verdict.

■ Our standard of review for these issues is similar, but not identical. In ruling on the trial court's denial of a motion for a j.n.o.v., we must take the strongest legitimate view of the evidence in favor of the non-moving party and disregard countervailing evidence. *Potter v. Ford Motor Co.*, 213 S.W.3d 264, 267–68 (Tenn. Ct.App.2006). A motion for a j.n.o.v. is justified only if "reasonable minds could not differ as to the conclusion to be drawn from the evidence." *Id.* Our review of the trial court's approval of a jury verdict is based on a "material evidence" standard. Under this standard, "appellate courts may only review the record to determine whether it contains material evidence to support the jury's verdict." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 718 (Tenn.Ct. App.1999) (citing Tenn. R.App. 13(d)); *see Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704 (Tenn.2000). As with the standard for reviewing the denial of a motion for a j.n.o.v., this Court must "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn.1978); *see also Foster v. Bue*, 749 S.W.2d 736, 741 (Tenn. 1988). The "material evidence" inquiry actually resolves both issues, because "[i]f there is material evidence to support the jury's findings, then, of necessity, granting a directed verdict [or j.n.o.v.] for the losing party would have been improper because the evidence permitted reasonable minds to reach a conclusion different from that asserted by the losing party." *Potter*, 213 S.W.3d at 268 (quoting *In re Estate of Brindley*, No. M1999–02224–COA–R3–CV, 2002 WL 1827578, at *2 (Tenn.Ct.App. Aug.7, 2002)).

Here, the jury determined that the handwritten document "is not a will." The Defendant now contends that no material evidence supported this finding, either as it relates to a formal will or a holographic

will. Rather, the Defendant claims, the evidence at trial proved that the document qualified as either type of will.

The requirements for a formal will can be found in Tennessee Code Annotated § 32–1–204, which provides:

The execution of a will, other than a holographic or nuncupative will, must be by the signature of the testator and of at least two (2) witnesses as follows:

(1) The testator shall signify to the attesting witnesses that the instrument is the testator's will and either:

(A) The testator sign;

(B) Acknowledge the testator's signature already made; or

(C) At the testator's direction and in the testator's presence have someone else sign the testator's name; and

(D) In any of the above cases the act must be done in the presence of two (2) or more attesting witnesses.

(2) The attesting witnesses must sign:

(A) In the presence of the testator; and

(B) In the presence of each other.

T.C.A. § 32–1–104 (2007). Thus, under the statute, the testator must signify to the attesting witnesses that the instrument is his will, and the witnesses must sign the instrument in the presence of each other. *See* 1 JACK W. ROBINSON, SR., AND JEFF MOBLEY, PRITCHARD ON WILLS AND ADMINISTRATION OF ESTATES, §§ 215–16 (5th ed.1994).

The Defendant argues that the undisputed evidence shows that the statutory requirements of a formal will were met, because the Decedent signed the document, he signified to the attesting witnesses that the instrument was his will, and the witnesses signed in his presence and in the presence of each other. The Plaintiffs claim, however, that material evidence submitted at trial refuted these claims, and that the jury was entitled to credit this countervailing evidence.

We agree that material evidence supported the jury's determination that the handwritten document did not meet the requirements of a formal will. Specifically, the testimony of Grosch in the first trial indicated that he and Lowery were not in the presence of the testator and/or each other when they signed the document. In March 2005, Grosch testified that Lowery was not in the room when the Decedent signed the purported will, but that she was "just outside the door." At the second trial, Grosch stated that he did not see Lowery sign the document, and that she was "in and out of the room" and checked on him "a couple of times" during the time period when he was signing it. The evidence also failed to show that the testator "signif[ied] to the attesting witnesses that the instrument is the testator's will" under the statute. Grosch testified that the Decedent ask him to "do him a favor," but he did not say that the Decedent referred to the document as his last will and testament. In fact, there is little evidence to suggest that the Decedent ever represented the document to be his formal last will and testament to anyone. In light of this and other evidence, we find that material evidence supported the jury's finding that the handwritten document was not a formal will.

 The requirements for a valid holographic will are as follows: "No witness to a holographic will is necessary, but the signature and all its material provisions must be in the handwriting of the testator and the testator's handwriting must be proved by two (2) witnesses." Tenn.Code Ann. § 32–1–105 (2003). In addition, "a testamentary intent must accompany the performance of the statutory requirements and this must be proven in a

manner which conforms to applicable rules of evidence and procedure." *Smith v. Smith*, 33 Tenn.App. 507, 232 S.W.2d 338, 341 (1949). "A holographic will, when the requirements of the statute are complied with, is of the same dignity as a will attested by subscribing witnesses." *Campbell v. Henley*, 172 Tenn. 135, 110 S.W.2d 329, 332 (1937).

 The parties do not dispute that the purported will satisfied two of the statutory requirements, i.e., it was drafted entirely in the Decedent's handwriting, and his handwriting was authenticated by two witnesses. The issue is whether material evidence supported the conclusion that the Decedent did not possess the requisite testamentary intent when he signed the document. In assessing testamentary intent, "it is immaterial whether a [testator] necessarily understands that by executing a particular document [he] is making a will, so long as the document demonstrates it was [his] clear intention to dispose of [his] property after [his] death...." *In re Meade*, 156 S.W.3d 841, 843–44 (Tenn.Ct. App.2004). Testamentary intent must be determined "from what [the testator] has written and not from what it is supposed he intended." *Id.* at 844 (quoting *Presley v. Hanks*, 782 S.W.2d 482, 488 (Tenn.Ct. App.1989)).

From our review of the record, we conclude that material evidence supported a finding that the Decedent lacked the necessary testamentary intent and that, therefore, the document was not a valid holographic will. The circumstances surrounding the Decedent's execution of the document do not indicate testamentary intent. None of the witnesses present when the Decedent wrote and signed the docu-

ment, not even Freddy, testified that the Decedent explicitly told them that he intended this document to be his will. Lowery and Freddy apparently assumed this fact, and Grosch simply did what was asked of him by signing a document that he admits he did not read. Moreover, regardless of the surrounding circumstances, the words of the written document must exhibit the testator's testamentary intent.[3] Here, while Lowery testified about previous conversations with the Decedent about the disposition of his property after his death, as noted above, the Decedent's testamentary intent must be determined "from what [the testator] has written and not from what it is supposed he intended." *In re Meade*, 156 S.W.3d at 844 (quoting *Presley*, 782 S.W.2d at 488). The document in question is far from clear. Written in barely legible handwriting just hours before the Decedent became unresponsive, it says only: "Freddy can do what ever he wants to with everything after I pass." The document has no heading, does not state that it is a last will and testament, and does not define the "everything" to which it refers. The evidence showed that Freddy, who lived with the Decedent before he died, had talked to the Decedent several times about making a will, while Terry and Bobbie had not. Moreover, Freddy, the only person to benefit from the purported will, assisted his father at this eleventh hour, without previously informing his siblings, who were conspicuously absent during this time and had no knowledge of what was taking place. Considering the surrounding circumstances and the ambiguity in the barely legible solitary statement written by the Decedent, there was material evidence for

---

**3.** Reviewing the context of the document for testamentary intent does not convert the issue from one of validity to one of construction, as the Defendant suggests. The terms of the document must be reviewed initially to determine whether final disposition of the Decedent's entire estate is contemplated in its terms.

the jury to conclude that the Decedent, rather than intending for the writing to operate as a will, may have intended it for another purpose, such as to placate Freddy. *See Smith*, 232 S.W.2d at 339–40 (finding that handwritten document entitled "Last Will and Testament" was not written with testamentary intent); *see also In re Meade*, 156 S.W.3d at 843. Therefore, because material evidence supported the conclusion that the Decedent did not possess the requisite testamentary intent, the trial court did not err in denying the Defendant's motion for a j.n.o.v., and the verdict must stand.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant/Defendant Herbert Fred Blackburn and his surety, for which execution may issue, if necessary.