IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 1, 2024

DENNIS STEVEN PAYNE V. ESTATE OF WILMUTH V. GROVES ET AL.

Appeal from the Chancery Court for Montgomery County
No. MG 22-7    Ben Dean, Chancellor

_____

No. M2023-01205-COA-R3-CV

_____

In this probate matter, the plaintiff filed a petition to establish a lost will, submitting for admission to probate a copy of a handwritten document alleged to be the decedent's holographic will. The trial court determined that the handwritten document met the requirements for a holographic will and that the plaintiff overcame the presumption of revocation afforded to a lost will. The decedent's intestate heirs appealed. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which CARMA DENNIS MCGEE and KRISTI M. DAVIS, JJ., joined.

Laurence M. McMillan, John Wallace Crow, II, and John F. Kelly, Clarksville, Tennessee, for the appellant, Leslie Jane Betland.

Travis Nathaniel Meeks, Clarksville, Tennessee, for the appellant, Aubree Hinton.

B. Nathan Hunt, Clarksville, Tennessee, for the appellee, Dennis Steven Payne.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Wilmuth V. Groves ("the decedent") died on March 26, 2022, at the age of 83. On April 22, 2022, Leslie Jane Betland (formerly Hinton), the decedent's granddaughter, filed a petition in chancery court asserting that the decedent died intestate and requesting that she be appointed administrator of the estate. The chancery court entered an order a few days later appointing Ms. Betland administrator of the decedent's estate.

On May 25, 2022, Dennis Steven Payne filed a petition to establish a lost will against the decedent's estate and the decedent's intestate heirs, Ms. Betland and Aubree Leeann Hinton, the decedent's great-granddaughter (collectively, "Defendants"). With the petition, Mr. Payne submitted a handwritten document dated June 7, 2021 ("the script"), which is reproduced below in its entirety:

- 2 -

The decedent's name and address appear at the top of the script, and her signature and the date appear at the bottom.

In the petition, Mr. Payne alleged that the original of the script had not been found but that "it is believed that the original Will may be located at the decedent's residence," to which Mr. Payne had been denied access. The script appears to give Mr. Payne the decedent's primary residence and other assets. It also includes bequests of two other pieces of real property and a checking account to Gene Stinson (the decedent's brother) and Soula R. Stinson (the decedent's sister-in-law), and a bedroom suite to Doretha ("Dee") Payne. According to the script, Ms. Betland is to receive $500 and pictures.

Ms. Betland objected to the admission of the script into probate as a holographic will on the grounds that the original document lacked testamentary intent; she asserted that "the absence of the original document proves that the decedent did not intend for such document to be her Last Will and Testament." Even assuming that the script was a valid will, Ms. Betland averred, Mr. Payne had failed to prove that the decedent had not revoked the will. A guardian ad litem ("GAL") was appointed to represent the interests of Ms. Hinton, a minor child.

The case was heard by the court in a bench trial over two days in December 2022 and January 2023. Mr. Payne, who is not related to the decedent, testified that he met her in 2015 and helped her take care of her rental property. He stated that, after the decedent's death, Ms. Stinson found the script and gave it to Mr. Payne. Two disinterested witnesses testified that the handwriting and signature on the script were the decedent's.

Attorney Mark Atchison testified that he had met with the decedent three times, the first time in June 2021 and the last in February 2022, concerning drafting a formal will. The decedent had shown him the original script, which he returned to the decedent. Mr. Atchison's records showed that he prepared a draft of a formal will on March 2, 2022, and he recalled providing the decedent with the final draft. The decedent became ill and was hospitalized soon thereafter, and she died on March 26, 2022. The formal will was never executed.

Ms. Stinson testified that she and her husband and Mr. Payne searched the decedent's house on the day after her death. She did not recall how long Mr. Payne was at the decedent's house after her arrival that day. Ms. Stinson found the script in a kitchen cabinet, and she gave the script to Mr. Payne. Ms. Stinson stated that she gave the key to the house to Ms. Betland on the day of the funeral.

Ms. Betland testified that, when she got possession of the decedent's home, it was a mess and that she changed the locks two weeks after the funeral because other people were entering the property. She did not find a will. Ms. Betland stated that, after the funeral, Ms. Stinson gave Ms. Betland the keys to the decedent's house and said that Ms.

Betland "would inherit it all." Michael Young, who knew the decedent and attended her funeral, testified that he heard Ms. Stinson tell Ms. Betland after the funeral that there was no will.

After the second day of trial, the court entered a final order including findings of fact and conclusions of law on February 14, 2023. The court found by clear and convincing evidence that Mr. Payne had established that the document dated June 7, 2021, was in the decedent's handwriting and that the statutory requirements for a holographic will had been met. The court further found that testamentary intent was present because the decedent "intended the document to be her will until she could have a more formal will prepared by Attorney Atchison." With respect to the lost original, the court made detailed findings of fact, and concluded by "clear, cogent and convincing evidence" that these facts rebutted the presumption that the decedent had destroyed or revoked the will.

Ms. Betland and Ms. Hinton both filed motions to alter or amend, which were denied by the trial court. Both appealed the trial court's decision. Defendants have raised two issues for our review: (1) Whether the trial court erred in determining that the script was a valid testamentary instrument; and (2) whether the trial court erred in finding that Mr. Payne had overcome the presumption that the holographic will had been revoked.

STANDARD OF REVIEW

We review a trial court's findings of fact after a non-jury proceeding de novo upon the record with a presumption of correctness, unless the evidence preponderates otherwise. *See* TENN. R. APP. P. 13(d); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012). We review the trial court's conclusions of law de novo with no presumption of correctness. *Rogers*, 367 S.W.3d at 204. When the trial court has heard the testimony of witnesses, we give "considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). We will not reject a trial court's "'assessment of witness credibility absent clear and convincing evidence to the contrary.'" *Id.* (quoting *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)).

ANALYSIS

I.      Testamentary intent

The first issue presented on appeal is whether the trial court erred in determining that the script was a valid testamentary instrument.

The script, if it qualifies as a will, must be a holographic will. Tennessee Code Annotated section 32-1-105 provides: "No witness to a holographic will is necessary, but

the signature and all its material provisions must be in the handwriting of the testator and the testator's handwriting must be proved by two (2) witnesses." The trial court found that these requirements were met, and the appellants do not dispute the trial court's determination as to the statutory requirements.

Beyond the statutory requirements, however, an instrument must evidence testamentary intent in order to constitute a valid will. *See In re Est. of Meade*, 156 S.W.3d 841, 844 (Tenn. Ct. App. 2004). The question of a will's validity is a question of fact, whereas the interpretation of a will's provisions is a question of law. *In re Est. of Blackburn*, 253 S.W.3d 603, 612 (Tenn. Ct. App. 2007). Here, the trial court had to determine whether the script evidenced testamentary intent and, thus, constituted a valid will, a question of fact.

Testamentary intent "must be 'proven in a manner which conforms to applicable rules of evidence and procedure.'" *In re Est. of Peery*, No. E2017-00603-COA-R3-CV, 2018 WL 3084529, at *2 (Tenn. Ct. App. June 21, 2018) (quoting *Smith v. Smith*, 232 S.W.2d 338, 341 (Tenn. Ct. App. 1949)). The court must look to what the testator has written to determine the testator's intent. *In re Est. of Blackburn*, 253 S.W.3d at 615. If testamentary intent is in doubt, "'all the facts or circumstances may be looked to, and it is for the jury to determine from all the evidence, intrinsic or extrinsic, whether or not the testator intended the instrument to operate as his will.'" *In re Est. of Peery*, 2018 WL 3084529, at *2 (quoting *Smith*, 232 S.W.2d at 341-42).

In this case, the trial court made the following findings and determination regarding testamentary intent:

> At first glance, the intestate heir's argument that the document/writing appears to be nothing more than mere notes or perhaps a memoranda for a will is quite persuasive. However, the uncontroverted testimony of the disinterested witnesses (Mr. [Godfrey] and Mrs. Garcia) established, to the satisfaction of the Court, that the Testator had shown these two close friends the subject writing prior to Decedent's death and that the Testator told these two witnesses that the subject document (whether the original or a copy) was her will. Her actions and statements to them manifested her belief that it was a valid will to take effect at her death to determine the disposition of her property. In the absence of these two witnesses the Petitioner's case would likely have failed with respect to testamentary intent. Mr. Atchison's testimony that the Decedent provided a copy of the document in order to prepare a formal will would perhaps support the argument of the intestate heirs that the script in issue was nothing more than a memorandum for a will, but these circumstances do not preclude the notion or circumstance that the Testator prepared the writing intending it to be her will and that she simply sought to seek a more formal will from Attorney Atchison. The Court finds

the two disinterested witnesses (Mr. [Godfrey] and Mrs. Garcia) to be honest and credible witnesses with regard to their interactions with the Decedent. Their testimony that Decedent showed them the subject writing and informed each of them that the document/writing at issue was her will, provides the Court clear, cogent and convincing proof that the Testator had testamentary capacity and the testamentary intent necessary to [show] that she intended the writing of June 7, 2021 to be her will and that it was to operate as a testamentary devise and instrument. Based on their testimony and consideration of the text of the document (including the language "goes to"), the writing signed and dated June 7, 2021 was something more than simply a memorandum for a will. The Decedent intended the document to be her will until she could have a more formal will prepared by Attorney Atchison.

The trial court placed great weight upon the testimony of two witnesses, Erica Garcia and Joe Godfrey. Ms. Garcia testified that she was a friend of the decedent for eight to ten years after meeting her at an auction. According to Ms. Garcia, the two met a few years after the death of the decedent's son, Jerry, and the decedent "just didn't have a lot of – didn't have any family that was coming by to see her." Ms. Garcia and her husband would spend time with the decedent in activities such as watching television with the decedent at her home or taking her out to dinner.

When presented with the script, Ms. Garcia testified that the handwriting and signature appeared to be those of the decedent. The decedent had shown her the original script, which was in a drawer in "a desk that sat next to her chair she sat in all the time." Ms. Garcia stated that the decedent "got sick shortly after this after she had showed it to me, and I'm one of the people that took her to the hospital."

Asked about the decedent's relationship with her granddaughter, Leslie, Ms. Garcia testified: "From my understanding, she had none." She further testified that, when the decedent spoke of Leslie, "it actually broke my heart because it was always very nasty." Ms. Garcia stated that, during the time she knew the decedent, the decedent did not have any relationship with Leslie. According to Ms. Garcia, "our conversations about Leslie always stemmed around the will."

Joe Godfrey testified that the decedent was "a good friend of me and my wife's" and that they would go to auctions and to her house. The Godfreys knew the decedent for ten or twelve years. Mr. Godfrey stated that the decedent showed him and his wife the original script. He recognized the handwriting and signature as belonging to the decedent. The following colloquy occurred:

THE COURT:        What did she tell you that [the script] was?
MR. GODFREY:   She said it's a will.
THE COURT:        She told you that?

MR. GODFREY: Yeah.
THE COURT: Why did she say she wanted to show y'all that?
MR. GODFREY: She just showed it to us because everybody was telling her she needed to write a will up.

Neither Mr. Godfrey nor Ms. Garcia received anything under the terms of the script.

On appeal, Defendants challenge the trial court's ruling that the script evidenced testamentary intent. As stated above, the issue of whether a document is a valid will is a question of fact. Therefore, we must determine whether the evidence preponderates against the trial court's ruling that the script shows testamentary intent.

Defendants argue that the script was "nothing more than a collection of notes," citing "circled provisions," "blue check marks when the other portions of the document were written in different ink,"[1] "incomplete sentences," and "reference to bank accounts in incomprehensible terms." As Defendants emphasize, the informality of an instrument can support an inference that the document was not intended to operate as a will. *See Smith*, 232 S.W.2d at 343 (holding that the informality of the instrument at issue, "when considered in the light of the business training, the habits and the accommodations of the deceased," supported the conclusion that the script was not intended to be effective as a will). Yet, a document's informality must be considered in light of other evidence that might support a contrary conclusion. *See id.* In *Crutcher v. Crutcher*, 30 Tenn. 377, 383 (1850), the Court explained:

So, if the instrument propounded as a will be imperfect in a technical sense, that is, if it appear[s] in the body of the instrument that it is unfinished and incomplete, this raises a presumption that the writer did not intend the paper in that imperfect state to be and to operate as his will.

And so, if it be not executed, that is, if it be not signed by the testator, or if there be an attestation clause and no attesting witnesses, from these omissions, a similar presumption arises against the paper as a will.

But these several presumptions against the validity of the paper as a will, may be rebutted and removed by proof satisfactory to the mind, that notwithstanding the informal character of the paper, or its unfinished state and condition, or its want of proper execution, yet, that it was intended in the form it appears and as far as it goes, to be the last will and testament of the deceased.

---

[1] The script in the appellate record does not show any differences in ink color.

In the present case, the trial court acknowledged the relevance of the script's informality, as well as the testimony concerning the decedent's plans to execute a formal will. However, the court found that the weight of the evidence, particularly the testimony of the two disinterested witnesses, supported the conclusion that the decedent intended the script to be her will until she was able to execute a formal will. The court found the testimony of Ms. Garcia and Mr. Godfrey credible and gave their testimony significant weight. In the absence of clear and convincing evidence to the contrary, this Court defers to the trial court's assessment of the witnesses' credibility and the weight it gave to that testimony. *Kelly*, 445 S.W.3d at 692.

Ms. Hinton asserts that Ms. Garcia "did not testify that [the decedent] said the document was her will." Upon examining the hearing transcript, we conclude that Ms. Hinton is correct that Ms. Garcia was not asked, and did not testify, that the decedent told her that the script she showed Ms. Garcia was her will. Mr. Godfrey, however, did expressly testify that the decedent told him that the script was her will, and his testimony is uncontroverted. Mr. Garcia's testimony is not inconsistent with the script being the decedent's will.

Based upon the record and affording deference to the trial court's credibility assessments, we conclude that the evidence does not preponderate against the trial court's finding that the script was made with testamentary intent and was, therefore, a valid holographic will.

II.      Presumption of revocation arising from a lost will

Because no one found the original of the script, the trial court had to determine whether Mr. Payne overcame the presumption that the decedent had destroyed or revoked her holographic will.

To establish a lost will, the proponent of the will must meet "a heavy burden of proof." *In re Est. of Leath*, 294 S.W.3d 571, 575 (Tenn. Ct. App. 2008). The burden of proof can be summarized as follows:

> "When a will cannot be found after the death of the testator, there is a strong presumption that it was destroyed or revoked by the testator himself, and this presumption stands in the place of positive proof. One who seeks to establish a lost or destroyed will assumes the burden of overcoming this presumption by adequate proof. It is not sufficient to show that persons interested to establish intestacy had an opportunity to destroy the will. One must go further and show by facts and circumstances that the will actually was lost or destroyed fraudulently or accidentally against, and not in accordance with, the wishes and intention of the testator.

The presumption that the will was destroyed by the testator, *animo revocandi,* may be rebutted, and its loss or destruction by other means may be shown, by circumstantial as well as positive evidence, [s]uch as: by showing that the testator did not have the custody and control of the instrument after its execution; that he had lost his testamentary capacity for a period before his death; that the will was in existence at the time the mental alienation occurred. The declarations of the testator, before or after making the will, are admissible in evidence to support or destroy the presumption of revocation."

*Id.* (quoting PRITCHARD ON WILLS AND ADMINISTRATION OF ESTATES § 51 (5th ed.)). The proponent of the will must show that it was not revoked by presenting "'the clearest and most stringent evidence'" or "'clear, cogent and convincing proof.'" *Shrum v. Powell*, 604 S.W.2d 869, 871 (Tenn. Ct. App. 1980) (quoting *Buchanan v. Matlock*, 27 Tenn. 389 (1847); *Wolfe v. Williams*, 1 Tenn. App. 441 (1925)). The reason for the exacting burden of proof is "'the fear that a more elastic rule might bring about more fraud than it would prevent.'" *Sanders v. McClanahan*, 442 S.W.2d 664, 667 (Tenn. 1969) (quoting *Haven v. Wrinkle*, 195 S.W.2d 787, 793 (Tenn. Ct. App. 1945)).

While the required burden of proof is substantial, "the proponent of a lost will is not required to overcome the 'almost impossible barrier' of proving absolutely, rather than circumstantially, that the will was not revoked." *In re Est. of Leath*, 294 S.W.3d at 575 (quoting *In re Est. of Brown,* No. 01A01-9809-PB-00471, 1999 WL 802718, at *11 (Tenn. Ct. App. Oct. 7, 1999)). Because cases in which the validity of a lost will is at issue "usually deal with deceased testators and interested parties, the evidence of the testator's intent or actions is most often circumstantial." *In re Est. of Roggli*, No. M2016-02562-COA-R3-CV, 2017 WL 4331040, at *2 (Tenn. Ct. App. Sept. 28, 2017). Thus, "[i]t is logical . . . that courts addressing these cases require more proof than the usual preponderance of the evidence." *Id.*

This Court has described the role of the appellate court in reviewing a trial court's ruling on a lost will:

While it rests primarily with the trial court to determine whether the evidence is clear, cogent, and convincing, its finding is not conclusive. In reviewing such cases, it is the duty of the appellate court to determine, not whether the trier of facts could reasonably conclude that it is more probable that the fact to be proved exists than that it does not, but whether the trier of facts could reasonably conclude that it is highly probable that the fact exists. *Estate of Acuff*, 56 S.W.3d 527, 534 (Tenn. Ct. App. 2001) (citations omitted). Therefore, the party with the burden of persuasion may prevail only if he or she can "place in the ultimate factfinder an abiding conviction that the truth of [his] factual contentions are 'highly probable.'" *Colorado v. New*

*Mexico*, 467 U.S. 310, [316] (1984). Accordingly, the determinative question under this standard of review is whether the Appellees have carried the burden to establish that it is "highly probable" that Decedent's 2007 will was not revoked by Decedent and should be established as a lost will.

*Id.* at *3.

The trial court concluded that it was "'highly probable' that the June 7, 2021, will was not revoked by the Decedent prior to her death." In reaching its conclusion that Mr. Payne met his burden of proof by clear, cogent and convincing evidence, the trial court made the following findings:

(1) The script/writing at issue was signed and dated June 7, 2021.

(2) According to the testimony of Attorney Atchison, the Decedent met with Attorney Atchison on June 6, 2021,[2] as well as on 3 occasions in February 2022 regarding preparation of a will, the last meetings of which took place the month prior to her death on March 26, 2022.

(3) The Decedent was placed in a nursing facility on March 25, 2022 and passed away on March 26, 2022. There was no evidence presented as to how long she was in the hospital prior to Decedent being placed in nursing care but the testimony was that she was taken to the hospital prior to her death.

(4) The Decedent's home was in disarray according to the testimony of the granddaughter, Mrs. Betland. Subsequent to Decedent's death and after becoming administrator, she proceeded to sort through the home and property of the Decedent. Mrs. Betland noted that it appeared that the home had been rummaged through. Mrs. Betland testified that the two safes in the home were opened and empty and that some of the possessions of the Decedent (to include jewelry) appeared to be missing. She testified that the Decedent frequented local auctions and appeared to have had some hoarding tendencies. Mrs. Betland stated that she located some important stock documents among the strewed papers and possessions in the home. The testimony that the state of the home of the Decedent was in such disarray supports a finding that the will was lost as opposed to it having been intentionally destroyed and revoked.

(5) The sister-in-law of the Decedent testified that multiple people, including three neighbors, had a key and access to the Decedent's home after she was placed in a nursing facility shortly before her death. Mrs. Garcia reported that she took her to the hospital the last time Decedent was at her home.

---

[2] As discussed more fully below, Mr. Atchison testified that he met with the decedent *the week* of June 6, 2021.

(6) The granddaughter, Mrs. Betland, testified that her relationship was practically non-existent for five years, that she was somewhat estranged and that this did not change in any way up and to the time of her death.

(7) Aside from Decedent's sister-in-law, the rest of the family, including the intestate heirs, did not have any relationship with the Decedent. (Mrs. Betland testified that her relationship with her grandmother was virtually non-existent). There was no evidence that the intent of the Decedent (with regard to the disposition of her property) changed in the short period of time between her last meetings with Attorney Atchison in February of 2022, her having been provided a copy of the draft will some time after March 2, 2022, her going into a hospital, her moving to a nursing facility on March 25, 2022 and her eventual death on March 26, 2022.

(8) The copy of the holographic writing was located in a kitchen cabinet drawer by Decedent's sister-in-law, Soula Stinson, along with other important papers, to include documents regarding her home health. The original of the will had previously been in the desk next to her chair, as testified to by Mrs. Garcia, indicating that the same had been removed from the desk at some point in time.

(9) The copy having been located within the Decedent's home also weighs in favor of a finding that the original was lost and not intentionally destroyed/revoked by the Testator. The copy was obviously not destroyed and since Decedent did not destroy the copy of the document, this tends to demonstrate she did not intentionally destroy or revoke the original of the same document. She provided this same document to Attorney Atchison.

(10) The copy of the will contains checkmarks indicating that Decedent was utilizing the copy of the holographic will as a checklist to make sure that the will drafted by Attorney Atchison contained these provisions or that she had set up the accounts as advised by Attorney Atchison. No testimony was provided, however, as to whether she did or did not set up the relevant bank accounts to be Payable on Death.

(11) The Testimony of Mrs. Garcia that she was shown the original will by the Decedent and which Decedent manifested to her was her will is credible. Shortly after Mrs. Garcia was shown the original will, she took the Decedent to the hospital, further showing that the Testator had continued with her same intentions as set forth in the will (as opposed to some intention to destroy or revoke the instrument) at least until shortly before she left the residence. This further narrows the window of time for her to have changed her mind from February when she last met with the Attorney Atchison, to closer to the time of her leaving her residence and being hospitalized. This is in contrast to the facts in the *Smith* case where the holographic will was very old and not made within a recent time of the decedent's death.

- 11 -

(12)   Attorney Atchison's draft of the will was prepared on March 2, 2022 after having met with Mrs. Groves on 4 occasions (three times in Feb. 2022 and once in June 2021 around the time the writing was dated by the Decedent.)  Although not signed or completed, the final draft of the formal will prepared by Attorney Atchison in large part mirrors the items contained on the subject writing/script dated June 7, 2021.  The Court notes that Attorney Atchison testified that the formal draft did not contain specific devise of the bank accounts, in so far as he advised her to make her bank accounts Payable on Death.  Attorney Atchison's testimony regarding her intent and having provided him with a copy of the same writing and having met with her multiple times in the short period prior to her death is given much weight by the Court in the case at bar, especially given the timing of their meetings and her death shortly after their having met in February 2022 three times.

(13)   By Mrs. Betland's own testimony, she and her grandmother were estranged and did not have contact in the years, months and weeks prior to her death.  Most notably, there was no contact during the short period of time between the meetings with Attorney Atchison and her death in March of 2022.  This supports the Court's finding that the Decedent did not have some change of heart, desire or intent to change her intentions as to the disposition of her estate as presented in the writing in issue and that the holographic writing was not intentionally destroyed or revoked by the Testator.  It is undisputed that the same has not been located and cannot be located.  The Court finds it highly probable that the Decedent's will is simply lost, as opposed to the Decedent having destroyed the will in the short weeks between her last meeting with Attorney Atchison and her leaving her residence to go into the hospital, going in to nursing care and passing on March 26, 2022.

(14)   Given her meeting with Attorney Atchison, the Decedent's testamentary intent (in terms of the effect of her will and her clear desire to have persons other than her heirs at law inherit the bulk of her estate) appears to have stayed the same and continued unchanged from the time of her preparation of the document in June 2021 until as late as February 2022.  It seems unlikely to the Court that Decedent in the absence of some change in her relationship with her granddaughter or other intestate heirs, that decedent (who appears to have been in declining and deteriorating physical health) would choose to revoke the holographic will, such that her estranged granddaughter and other intestate heirs would receive any of her property.  Her preparation of the document and subsequent meetings with the attorney regarding the same solidify her continued intent through as late as February 2022, one month before her death.  The terms of her will indicate her clear desire/intent to have persons other than her heirs-at-law inherit the bulk of her estate.  It does not appear that her

intent changed since there was no change in her relationship with her granddaughter or other heirs in the approximately one to two months before her death as her physical health was declining. It appears that based on the testimony of Attorney Atchison and Mrs. Garcia, as well as the granddaughter, Mrs. Betland's description of the condition of the home (feces and urine throughout the home), that the Decedent was ill and that her physical condition was deteriorating during the last month of her life.

The trial court concluded that these "facts and evidence adequately rebut the presumption that Mrs. Groves destroyed or revoked her handwritten will dated June 7, 2021 by clear, cogent and convincing evidence." The court observed that "the overwhelming evidence is that she would not likely have changed her express intentions in the last month of her life." Furthermore, the court stated, "[t]he lack of security of her home, the condition of the home being in disarray, her declining physical health in the month leading to her death and the disturbed condition of the home also yield further support and evidence for the Court's finding that the original holographic will was and is simply lost."

On appeal, Ms. Betland cites statements in paragraphs 4, 5, and 8 of the trial court's findings--specifically, the trial court's references to the fact that the original will was not found in the desk where it had been, the fact that the decedent's home was in disarray, and the fact that multiple people had access to the home after the decedent was placed in nursing care before her death. These findings formed part of the basis for the trial court's conclusion that the will was lost and not intentionally revoked or destroyed. Ms. Betland asserts that "such supposition and guesswork by the court below does not overcome the presumption of revocation." The only authority cited by Ms. Betland in support of her one-sentence argument is the following quotation from *Sanders v. McClanahan*, 442 S.W.2d 664, 668 (Tenn. Ct. App. 1969): "Since [the decedent] kept the will in his own possession, the fact that it could not be found after his death raises the presumption the will has been cancelled by the testator." This quotation is merely a restatement of the law regarding the presumption of revocation. Ms. Betland has not identified any similarities between the present case and the facts in *Sanders*, in which the court reached the conclusion that the presumption had not been rebutted. In *Sanders*, this Court rested its judgment primarily on the complainants' failure to prove the execution or contents of the alleged lost holographic will. *Sanders*, 442 S.W.2d at 667-68. The court also found that the complainants failed to overcome the presumption of revocation, noting that the facts proven by the complainants would not support a conclusion that the "testator did not within the remaining months of his lifetime destroy the will with the intention [of] revoking it." *Id.* at 668. As discussed by the trial court in the present case, the window of time between the decedent's showing of the will to Ms. Garcia and her final illness and death was fairly narrow. Further, the trial court based its conclusion on all of the facts and circumstances described in his opinion, not only upon those identified by Ms. Garcia.

- 13 -

The only other argument raised by Ms. Betland on this issue was her objection to the trial court's so-called "Xerox jurisprudence." In particular, Ms. Betland cites the following statement in the trial court's order: "These cases [referring to cases, including *Sanders*, cited by Respondents describing the "almost insurmountable burden" of proof] arose from an era in time when there was not likely the copying capability that is widely available today." It is important to point out that the trial court made this statement in the section of his order addressing the substance and contents of the decedent's will. The substance and contents of the will is an element of the proof that must be established by the proponents of a lost will. *See Sanders*, 442 S.W.2d at 667 (listing the following elements: "(1) that the testator made and executed a valid will in accordance with the forms of law and the death of the testator; (2) that the will had not been revoked and is lost or destroyed or cannot be found after due and proper search; and (3) the substance and contents of the will."). In this appeal, Defendants did not raise as an issue the trial court's ruling on the substance and contents of the will. Moreover, the existence of an exact copy of the lost will is relevant to the trial court's analysis on that issue. The trial court did not rely on the existence of an exact copy in making its ruling on the presumption of revocation. Therefore, this argument is without merit.

In her brief, Ms. Hinton emphasizes purported inconsistencies in the witnesses' testimony. She asserts that "Payne or Stinson lied about exhibit One [the script]" and that Mr. Payne's testimony contradicts Ms. Stinson's testimony. We disagree that there is any inconsistency between the testimony of these two witnesses. Mr. Payne testified that he obtained the script from Ms. Stinson; Ms. Stinson testified that she and her husband and Mr. Payne conducted a thorough search of the decedent's home and Ms. Stinson found the script in a kitchen cabinet. Based upon these witnesses' testimony, it appears that Ms. Stinson found the script and then gave it to Mr. Payne, who was not present when Ms. Stinson made the discovery. Ms. Stinson has not provided any evidence to support her assertion that Mr. Payne or Ms. Stinson lied. The trial court found these witnesses credible, and we will defer to the trial court's credibility findings absent clear and convincing evidence to the contrary.

Another purported inconsistency raised by Ms. Hinton is the testimony of Ms. Betland that Ms. Stinson told her there was no will even though Ms. Stinson testified that she found the script. The trial court addressed this issue directly, stating: "Mrs. Stinson's statement regarding the existence of a will, even if made, would not be surprising to the Court given a layperson's lack of understanding of the validity of a holographic will versus a formally executed will." Further, Ms. Hinton argues that Mr. Atchison's testimony regarding the script being the same document given to him by the decedent is inconsistent with the script's date of June 7, 2021. In paragraph (1) (quoted above) of the trial court's findings on the presumption of revocation, the court stated that "the Decedent met with Attorney Atchison on June 6, 2021." Mr. Atchison's exact testimony, however, based on his office notes, was that he met with the decedent "the week of June 6th, 2021." In the trial court's summary of Mr. Atchison's testimony in its findings of fact and conclusions,

- 14 -

the trial court referred to the week of June 6, 2021. Thus, there is no contradiction between the date to which Mr. Atchison testified and the date on the script.

Having examined the record and the trial court's opinion, we affirm the trial court's determination that there is clear, cogent, and convincing proof to rebut the presumption of revocation.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellants, Leslie Jane Betland and Aubree Hinton, for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE