IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 9, 2024 Session

IN RE ESTATE OF BILLY F. HAWK JR. ET AL. V. CHAMBLISS, BAHNER
& STOPHEL P.C.

**Appeal from the Circuit Court for Hamilton County
No. 20C350     Robert E. Lee Davies, Senior Judge**

_____

**No. E2022-01420-COA-R3-CV**

_____

The appellants sued the appellee, a law firm, alleging that the law firm committed legal malpractice when it gave the appellants legal advice with regard to the tax implications of a stock sale. The law firm filed two motions for summary judgment arguing that the legal malpractice case was barred by the applicable statute of limitations. Both motions were denied when the trial court determined that a genuine issue of material fact existed. The case proceeded to a jury trial, and the jury found that the legal malpractice case was timely filed but that the law firm had not committed legal malpractice. Upon our diligent review of the record, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court for Hamilton County Affirmed**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Lawson Konvalinka, Signal Mountain, Tennessee, and Michael E. Richardson, Chattanooga, Tennessee, for the appellants, Billy F. Hawk, Jr. GST Non-Exempt Marital Trust, Nancy Sue Hawk, Billy F. Hawk, Jr. GST Exempt Marital Trust, and Estate of Billy F. Hawk, Jr.

Gregory Brown, Knoxville, Tennessee, for the appellee, Chambliss, Bahner & Stophel, P.C.

## OPINION

### BACKGROUND

Nancy Sue Hawk and Billy F. Hawk, Jr., a married couple, were the sole shareholders of Holiday Bowl, Inc. ("Holiday Bowl"), a corporation that owned and managed two bowling alleys. After Mr. Hawk's death, Mrs. Hawk decided to sell the business. Mrs. Hawk found a broker, Sandy Hansell, who specialized in bowling alley sales. Mr. Hansell agreed to assist Mrs. Hawk and the estate of Billy F. Hawk, Jr. (the "Estate")[1] with selling the assets of Holiday Bowl. Throughout the planning and closing of the asset sale, Mrs. Hawk and the Estate[2] sought legal advice from the law firm of Chambliss, Bahner & Stophel, P.C. ("Chambliss"), in particular, attorney Wayne Thomas. Mr. Thomas had represented the Hawks for many years prior to Mr. Hawk's death and was representing the Estate in ongoing probate proceedings. Mr. Thomas had limited experience with corporate transactions and sought assistance with the asset sale from other attorneys at Chambliss, including Kirk Snouffer, a tax attorney, and Mark Turner, a transactional attorney.

In March 2003, after identifying a purchaser for Holiday Bowl's assets, Mr. Hansell sent Chambliss a letter introducing MidCoast Investments ("MidCoast"), a company that "ha[d] created an ingenious program to work with C Corporations selling their assets which proves beneficial to sellers (and to Mid-Coast)." Although he conceded that he did not fully understand how the proposed transaction would work, he claimed that through MidCoast's strategy, "several hundred thousands of dollars of taxes are eliminated." He finished the letter, "I know the old adage that, if it seems too good to be true, it probably is. But maybe this is the exception." In response to this letter, Mrs. Hawk and Mr. Kelley retained Chambliss and accountant Dan Johnson of the accounting firm of Johnson, Hickey & Murchison, P.C. ("JHM") to perform due diligence and provide tax and legal advice on the risks and benefits of the potential sale of Holiday Bowl's stock to MidCoast (the "MidCoast transaction").

After reviewing materials provided by MidCoast to Chambliss regarding the proposed transaction, Mr. Thomas wrote to Mrs. Hawk and Mr. Kelley on August 14, 2003, stating in relevant part:

---

[1] After Mr. Hawk's death, his shares in Holiday Bowl became property of his probate estate.

[2] Regions Bank, formerly known as AmSouth Bank, is a Co-Executor of the Estate and a Co-Trustee of two testamentary trusts. At all times relevant, Regions acted by and through Rob Kelley, its authorized representative, with respect to the Estate and the trusts. Mrs. Hawk is the other Co-Executor and Co-Trustee.

This will confirm our discussion on August 6 concerning the potential sale of all of the outstanding stock of Holiday Bowl, Inc. to MidCoast Investments, Inc. . . .

We have taken various actions in reviewing this potential transaction. We have reviewed the federal tax laws surrounding the transaction; we have discussed MidCoast, its history, business practices and business plans with the President of MidCoast, Michael Bernstein; we have discussed the potential transaction and past similar transactions entered into by MidCoast with the Certified Public Accountant who has assisted MidCoast with these transactions; and we have discussed similar transactions with attorneys who have represented MidCoast and other parties in similar transactions.

* * *

Based on the discussions with Mr. Bernstein, the accountant, and the attorneys who have represented MidCoast in similar transactions, we have concluded: that MidCoast is involved in a legitimate business; that MidCoast would be benefited by this transaction; and that it has accomplished a number of similar transactions over the past several years, apparently without difficulty with regard to the IRS.

* * *

We have concluded that it would be a reasonable exercise of the Executors' discretion to proceed with this transaction provided that MidCoast provides sufficient financial information so we may all be satisfied that it has the financial strength to fulfill its indemnity if the need should arise.

The next step will be to negotiate some changes in the Letter of Intent. We suggested that you authorize us to proceed with that negotiation. You have given us that authority and we are proceeding with negotiations. We will include in that process a request for the necessary financial data from MidCoast.

MidCoast never provided any financial information to Chambliss. Despite this, on September 8, 2003, Mr. Thomas forwarded a Letter of Intent from MidCoast to Mrs. Hawk and Mr. Kelley and opined:

We attempted to obtain financial statements for the MidCoast companies, in order to make a determination of the credit-worthiness of the

company that will give an indemnity to Holiday Bowl shareholders. MidCoast declined to provide us with financial statements. We do not consider that unusual since the MidCoast companies are privately-held. Many privately-held companies decline to provide financial information to any parties other than essential lenders.

While we were not able to obtain financial statements on MidCoast, we did obtain agreement that MidCoast Credit Corp. would guarantee the indemnity. MidCoast Credit Corp. is the parent company of the MidCoast companies. In other words, it owns all of the various companies within the MidCoast framework.

The possibility that the selling shareholders of Holiday Bowl will be liable for income tax is remote. We have reviewed the tax law, as has Dan Johnson's office. We and Dan Johnson's office have concluded that the transaction is not one which under current law would allow the Internal Revenue Service to assess income tax against the selling shareholders.

If despite this conclusion, the Internal Revenue Service should find a way to impose such a tax on the selling shareholders, the indemnity of MidCoast Credit Corp. is the second line of defense for the shareholders. MidCoast Credit Corp[.] is the MidCoast entity with the greatest financial net worth in MidCoast organization. Therefore, we consider that entering into the transaction contemplated in the Letter of Intent is a reasonable exercise of fiduciary discretion.

The Letter of Intent indicated that MidCoast would cause Holiday Bowl to pay its 2003 income taxes to the extent due; however, the parties understood that MidCoast intended for Holiday Bowl's post-closing business activities to result in it neither owing nor paying any 2003 income taxes.

Mrs. Hawk and the Estate executed a Share Purchase Agreement with MidCoast on November 12, 2003. MidCoast prepared the relevant transactional documents, and Chambliss edited the documents. On the transaction closing date, Holiday Bowl's cash on hand was transferred to an escrow agent who then forwarded the net purchase price to Mrs. Hawk and the Estate on the same day. In total, Mrs. Hawk received $753,015.00 from the MidCoast transaction and a related Holiday Bowl stock redemption. The Estate received $3,466,286.00, of which $1,912,665.00 was transferred to the Billy F. Hawk, Jr. GST Non-Exempt Marital Trust (the "Non-Exempt Trust") and $511,976.00 was transferred to the Billy F. Hawk, Jr. GST Exempt Marital Trust (the "Exempt Trust") (together, the "Trusts").

On March 9, 2007, the IRS wrote to Mrs. Hawk, individually, to inform her that it was "in the process of examining" Holiday Bowl's 2003 tax return and that Mrs. Hawk "may be liable" as a transferee of Holiday Bowl "for part or all of its potential tax liability under [Internal Revenue Code] Sec[tion] 6901."[3]  Ultimately, on September 23, 2009, the IRS sent Mrs. Hawk a Notice of Liability informing her that it would be assessing liability against her in the amount of $734,396.00, plus interest, as her portion of Holiday Bowl's 2003 unpaid income taxes and the associated penalties.  The Non-Exempt Trust was sent a Notice of Liability on the same date, informing it that the IRS would be assessing liability against it in the amount of $511,976.10, plus interest.  The Exempt Trust was sent a Notice of Liability on September 29, 2009, informing it that the IRS would be assessing liability against it in the amount of $965,358.00, plus additional accuracy-related penalties of $378,107.00 and interest.  The Estate was also sent a substantively identical Notice of Liability on the same date.  On November 25, 2009, Mrs. Hawk, the Estate, and the Trusts (together, the "Hawk Parties") signed a tolling agreement with Chambliss tolling any statute of limitations that had not yet expired for any claim the Hawk Parties or Chambliss may have had against the other.

In late 2009, the Hawk Parties filed suit in the United States Tax Court (the "tax court") challenging the tax assessments, but ultimately lost.  While Chambliss was not a party to the tax court proceedings, its legal advice provided to the Hawk Parties with respect to the MidCoast transaction was at issue in that case.  The tax court held, in relevant part:

> . . . [the IRS] must prove that [the Hawk Parties] had actual or constructive knowledge that MidCoast would cause Holiday Bowl to fail to pay its 2003 income tax. . . . [the Hawk Parties] had constructive knowledge under either [potentially applicable] standard. . . .
>
> [The Hawk Parties] knew from the outset that the underlying purpose of the MidCoast transaction was to obtain a financial benefit from the nonpayment of Holiday Bowl's 2003 income tax. . . . They chose to engage in both transactions [at issue] as a tax-avoidance strategy. From the beginning their advisers[4] should have known "it seems to good to be true", as Mr. Hansell stated in his written correspondence introducing the MidCoast

---

[3] "Section 6901(a) does not independently impose tax liability upon a transferee, but provides a procedure through which the IRS may collect unpaid taxes owed by the transferor of the assets from a transferee if an independent basis exists under applicable State law or State equity principles for holding the transferee liable for the transferor's debts."  *Upchurch v. Comm'r*, 100 T.C.M. (CCH) 85 at *3 (T.C. 2010) (citing *Comm'r v. Stern*, 357 U.S. 39, 45 (1958)).

[4] The Tax Court refers collectively to Chambliss and JHM as the Hawk Parties' "advisers" throughout its Opinion.

transaction. There were numerous red flags that should have raised the concerns of [the Hawk Parties]' advisers . . . .

While [the Hawk Parties] claim that MidCoast misrepresented its business plan and tax strategy, [the Hawk Parties]' advisers did not attempt to confirm MidCoast's representations. [The Hawk Parties]' advisers did not request any documentation to verify MidCoast's representations. They contacted only references who were advisers involved in prior MidCoast deals who merely confirmed that MidCoast closed the deals it started. They did not contact any references in the asset recovery business to determine MidCoast's reputation or whether MidCoast was in fact engaged in an asset recovery business. . . . In addition, MidCoast's alleged tax strategy should have raised concerns for [the Hawk Parties]' advisers . . . .

Moreover, the share purchase agreement expressly stated that [the Hawk Parties] could not rely on MidCoast's representations made during the negotiation process. By contrast, the share purchase agreement in *Alterman Tr. [v. Comm'r of Internal Revenue*, 110 T.C.M. (CCH) 507 (T.C. 2015),] contained specific covenants that [protected the taxpayers in that case]. [The Hawk Parties] did not seek to include similar contractual provisions in the share purchase agreement . . . . Rather than obtain this type of protection for their clients, [the Hawk Parties]' advisers relied on the indemnity from MidCoast, the parent guaranty, and the fact that MidCoast had previously engaged in similar transactions. The advisers' due diligence is not sufficient to protect [the Hawk Parties].

*Hawk v. Comm'r*, 114 T.C.M. (CCH) 501, 2017 WL 5151379, at \*15–16 (T.C. 2017). Ultimately, the tax court ruled in favor of the IRS in all respects and entered judgments against Mrs. Hawk for $734,396.00, against the Estate and the Non-Exempt Trust for $1,343,465.00, and against the Exempt Trust for $511,976.10. The Hawk Parties appealed, and the Sixth Circuit Court of Appeals (the "Sixth Circuit") affirmed the tax court's judgment on May 15, 2019. *See Billy F. Hawk, Jr., GST Non-Exempt Marital Tr. v. Comm'r*, 924 F.3d 821, 826 (6th Cir. 2019).

On March 10, 2020, the Hawk Parties filed suit in the Hamilton County Circuit Court (the "trial court") against Chambliss and JHM.[5] The Hawk Parties averred that they sought tax and legal advice from Chambliss with respect to the MidCoast transaction, that Chambliss owed the Hawk Parties a duty "to act with that degree of care, skill, and diligence commonly possessed and exercised by attorneys practicing in Tennessee in the

---

[5] The Hawk Parties' claim against JHM was separately disposed of, and only their claim against Chambliss is at issue in this appeal.

subject matter of the engagement[,]" that Chambliss breached that duty of care, and that the Hawk Parties incurred damages as a result.

On June 5, 2020, Chambliss filed a "Motion to Dismiss or for Summary Judgment" arguing that the Hawk Parties' claim against it was barred by the one-year statute of limitations applicable to legal malpractice claims, which Chambliss posited ran prior to the execution of the November 2009 tolling agreement. The trial court analyzed the discovery rule that tolls the running of the statute of limitations in certain legal malpractice cases. The second prong of the discovery rule requires that, prior to the statute of limitations beginning to run, the plaintiff "must have known or in the exercise of reasonable diligence should have known that [their] injury was caused by the defendant's wrongful or negligent conduct." Ultimately, the trial court "[was] not prepared to conclude that the statute of limitations began to run" more than one year prior to the execution of the tolling agreement in November 2009 because:

> Although [Chambliss] argue[s] that [Mrs. Hawk's personal attorney, John] Konvalinka should have been advising M[r]s. Hawk that there was a problem and that [Chambliss] may have committed malpractice, Mr. Konvalinka's declaration indicates he was not involved in any of the issues with the IRS except to communicate with M[r]s. Hawk at the bequest of Mr. Thomas, make her available to the IRS, and sign the extension. Mr. Konvalinka makes clear that he was not even aware of the advice given by [Chambliss] until September 2009 when he discovered the 2003 letters. It was at that time that he realized there was a possibility of malpractice and so advised M[r]s. Hawk.

After the denial of this motion, the parties engaged in additional discovery, and Chambliss renewed its motion based on additional evidence it had received through discovery; however, the trial court also denied the Second Motion for Summary Judgment, holding

> . . . [Chambliss] has obtained additional documentation from [the Hawk Parties'] attorneys which [Chambliss] argued provided constructive notice to Mr. Konvalinka of the potential malpractice claim against [Chambliss]. However, . . . [w]hat Mr. Konvalinka actually knew and what reasonable inferences should be drawn from his prior correspondence still remain disputed facts which will have to be decided by the jury.

The case proceeded to a jury trial that took place from June 20 to June 28, 2022. The jury found that the statute of limitations had not expired on the Hawk Parties' claim but also that Chambliss was not negligent in providing legal advice and representation to the Hawk Parties in 2003. The Hawk Parties filed a Motion for New Trial, which the trial court denied. This timely appeal followed.

ISSUES

The Hawk Parties present the following issues, which we slightly restate and condense:

1. Whether the trial court erred in denying the Hawk Parties' pre-trial motions asking that the trial court take judicial notice of the opinions issued by the tax court and the Sixth Circuit (together, the "Tax Opinions").

2. Whether the trial court erred in excluding discussion of the Tax Opinions at trial.

3. Whether the trial court erred in granting Chambliss's pre-trial motion asking that the trial court take judicial notice of criminal court filings involving various MidCoast principals.

4. Whether the jury's verdict is supported by material evidence.

Chambliss raises one substantive issue,[6] which we slightly restate:

5. Whether the trial court erred in denying Chambliss's motions for summary judgment with respect to its statute of limitations defense.

## DISCUSSION

### A.

### i.

"We review a trial court's decision to admit or exclude evidence, including a ruling following a motion in limine, under the abuse of discretion standard of review[.]" *Allen v. Albea*, 476 S.W.3d 366, 377 (Tenn. Ct. App. 2015) (citing *Dickson v. Kriger*, 374 S.W.3d 405, 408 (Tenn. Ct. App. 2012)). As this Court has explained:

A trial court abuses its discretion "only when it 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247

---

[6] Chambliss also raises a procedural issue regarding whether the Hawk Parties "waived various assignments of error" related to the trial court's exclusion of discussion of the Tax Opinions at trial. Specifically, Chambliss argues that the Hawk Parties failed to properly brief these issues on appeal and failed to preserve these issues at the trial court level. Upon our diligent review of the record and the Hawk Parties' briefing to this Court, we conclude that these issues have not been waived.

(Tenn. 1999)). Under this standard, we will not substitute our judgment for the judgment of the trial court. *Id.* (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998)). The abuse of discretion standard "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,'" and therefore "'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010) (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

*Id.* at 373.

### ii.

The Hawk Parties first argue that the trial court erred when it denied their motions in limine to take judicial notice of the law and facts contained in the Tax Opinions pursuant to Rules 201 and 202 of the Tennessee Rules of Evidence. Rule 201 deals with judicial notice of adjudicative *facts* and provides, in relevant part:

(b) Kinds of Facts. A judicially noticed fact must be one not subject to reasonable dispute, in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

(c) When Discretionary. A court may take judicial notice whether requested or not.

(d) When Mandatory. A court shall take judicial notice if requested by a party and supplied with the necessary information.

Tenn. R. Evid. 201. Rule 202 deals with judicial notice of *law* and provides, in relevant part, "[t]he court shall take judicial notice of (1) the common law . . . ." Tenn. R. Evid. 202(a).

The Hawk Parties argue that the trial court should have taken notice of the tax court's "determination that the [Hawk Parties] could be held liable for the tax if their advisors' work was deficient, that Chambliss was deficient in performing due diligence on the Mid[C]oast [t]ransaction, and that Chambliss's work on the transaction documents was deficient." The trial court denied the Hawk Parties' motions for judicial notice, holding that the Tax Opinions contained inadmissible hearsay.

The Hawk Parties insist that the Tax Opinions did not contain inadmissible hearsay because they were not offered for the truth of the matter asserted:

> Because the central issue of the [Hawk Parties]' claim is that they relied upon Chambliss's advice in proceeding with the MidCoast [t]ransaction, it is relevant that the jury understand the [t]ax [c]ourt and Sixth Circuit's decision as to why they were found liable. This is not the same as offering the opinions for the truth of the matter asserted or for prejudicial effect . . . the purpose of introducing the [t]ax [c]ourt [o]pinion was not to show that the factual statements in the [t]ax [c]ourt [o]pinion were true, but to inform the jury upon what conclusions the [t]ax [c]ourt made its decision that the [Hawk Parties] were liable for the taxes.
>
> . . . The [Hawk Parties] contend that they were subjected to a negative outcome in the [t]ax [c]ourt due to Chambliss's deficient due diligence, the illusory structure of the transaction, and contracts that did not sufficiently protect them. Under the Tennessee Rules of Evidence, they should have been permitted to introduce the findings of the [t]ax [c]ourt [o]pinion wherein it stated they were liable for these very reasons.

Additionally, finding no Tennessee case law on point, the Hawk Parties cite *Spencer v. Badgley Mullins Turner, PLLC*, 432 P.3d 821 (2018), to bolster their argument that the Tax Opinions are not being offered for the truth of the matter asserted. We do not agree that *Spencer* is analogous to this case. Although *Spencer* arose from a legal malpractice action, it involved alleged malpractice that occurred during a trial in the plaintiffs'/clients' original lawsuit in which the defendant/attorney had represented them. *Id.* at 828. The plaintiffs argued that they were unsuccessful in their original lawsuit because the attorney failed to present to the factfinder certain evidence that the plaintiffs provided to the attorney. *Id.* at 828–29. The trial court hearing the malpractice case admitted as evidence excerpts of an opinion issued by the Washington Court of Appeals reviewing the judgment entered in the plaintiffs' original lawsuit; on appeal, the attorney argued that the appellate court's opinion was inadmissible hearsay and that the trial court's admission of it was in error. *Id.* at 832. The *Spencer* court found no error, concluding that the earlier appellate opinion was not offered to prove what the trial court found "but, rather, to demonstrate what evidence was presented in the underlying case proceedings." *Id.* at 833. Conversely, in this case, the Hawk Parties seek to use the Tax Opinions for the truth of the matter asserted.

Instead, this case is more like *In re Det. of Pouncy*, 184 P.3d 651 (Wash. Ct. App. 2008), *aff'd*, 229 P.3d 678 (Wash. 2010), which was discussed in *Spencer*. *Pouncy* involved the appeal of an order authorizing the appellant's/defendant's commitment as a sexually violent predator. 184 P.3d at 653. To obtain the commitment, the State was

required to show that the defendant suffered from a mental abnormality or personality disorder that made him likely to engage in predatory acts. *Id*. The defendant offered expert witness testimony to show that he did not suffer from a mental abnormality or personality disorder. *Id*. The State used findings of fact made by a different judge in an unrelated case to attack the methodology used by the defendant's expert witness. *Id*. at 658. On appeal, the Washington Court of Appeals concluded that the findings of fact from the unrelated case were inadmissible, noting "[i]t is well-established that 'judicial findings in other cases proffered as evidence are generally characterized as inadmissible hearsay.'" *Id*. at 659 (citing *McCormick on Evidence* § 318, at p. 894 (3d ed.1984)). Moreover, the *Pouncy* court found that the judicial findings from the earlier case were more prejudicial than probative:

> The proposed evidence is inadmissible. It is also unfair. When a judge attacks a witness there is no effective defense. Peer review of such witnesses is different; if an expert does not act properly that expert ought to be attacked in the normal course of scientific debate—or in the case of a trial, with the opportunity for rehabilitation and explanation. To appropriately meet the evaluations of another judge would require the jury to delve deeply into the case that judge was trying. This enterprise is not appropriate under Rule 403.

*Id.* at 660 (quoting with approval *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 141 F. Supp. 2d 320, 325 (E.D.N.Y. 2001)). Applying these principles to the facts of this case, we likewise conclude that the findings of fact from the Tax Opinions are inadmissible hearsay and are more prejudicial than probative.

It is well-settled that evidence which is inadmissible under the Tennessee Rules of Evidence "cannot be judicially noticed" pursuant to Rule 201. *Walker v. State*, No. W2000-03079-COA-R3-CV, 2002 WL 32332069, at *3 (Tenn. Ct. App. Feb. 5, 2002) (citing *Standard Life Ins. Co. of the South v. Strong*, 89 S.W.2d 367, 379 (Tenn. Ct. App. 1935)); *see State v. Henretta*, 325 S.W.3d 112, 144 (Tenn. 2010) ("Rule 201 . . . does not allow a court to take judicial notice of hearsay statements . . ."). To prevail on their legal malpractice claim, the Hawk Parties must prove that they were owed a duty by Chambliss, that Chambliss breached that duty, and that the Hawk Parties suffered damages caused by Chambliss's breach of its duty. *See Jones v. Allman*, 588 S.W.3d 649, 655 (Tenn. Ct. App. 2019). "A plaintiff can show breach of the duty owed by an attorney by demonstrating that 'the attorney's conduct fell below that degree of care, skill, and diligence which is commonly possessed and exercised by attorneys practicing in the same jurisdiction.'" *Id.* (citing *Sanjines v. Ortwein and Assocs., P.C.*, 984 S.W.2d 907, 910 (Tenn. 1998)). Although the Hawk Parties insist that they are not offering the Tax Opinions for the truth of the matter asserted, it is clear from their briefing that they hope to use those opinions to show that Chambliss "was deficient in performing due diligence on the Mid[C]oast [t]ransaction" and that its "work on the transaction documents was deficient." In other

words, the Hawk Parties were hoping to use the Tax Opinions to conclusively establish that Chambliss's conduct fell below that degree of care, skill, and diligence commonly possessed and exercised by Tennessee attorneys. As such, the Tax Opinions were offered for the truth of the matter asserted, and the conclusions contained therein are inadmissible hearsay. Given this, and the fact that the Hawk Parties do not argue on appeal that the Tax Opinions fall within any hearsay exception contained within the Tennessee Rules of Evidence, we conclude that the trial court did not abuse its discretion in denying the Hawk Parties' motion made pursuant to Rule 201.

We reach the same result in reviewing the denial of the Hawk Parties' motion made pursuant to Rule 202. Notably, while Rule 201 requires the trial court in a civil action to "instruct the jury to accept as conclusive any *fact* judicially noticed[,]" Tenn. R. Evid. 201(g) (emphasis added), Rule 202 contains no such requirement. *Latiff v. Dobbs*, No. E2006-02395-COA-R3-CV, 2008 WL 238444, at *6 (Tenn. Ct. App. Jan. 29, 2008); *see* Tenn. R. Evid. 202. Accordingly, "just because a court takes judicial notice of the law, the court is not required to admit that law into evidence." *Id.* at *8; *see Montepeque v. Adevai*, No. E2009-01871-COA-R3-CV, 2010 WL 3025541, at *9 (Tenn. Ct. App. Aug. 4, 2010) (citing *State v. Zelek, II*, No. M2007-01776-CCA-R3-CD, 2009 WL 890904, at *7 (Tenn. Crim. App. Apr. 3, 2009)). However, the Hawk Parties do not argue that the trial court erred in not *considering* the law contained within the Tax Opinions; instead, they argue that the Tax Opinions should have been admitted as evidence. This is not required by Rule 202. "It is the duty of the judge to state the principles of the law to the jury which are applicable to the facts of the case before him, and if he does this correctly, there is no error." *Whitaker v. Pullen*, 22 Tenn. 466, 467 (1842). The Hawk Parties do not include in their statement of the issues presented to this Court any purported error by the trial court in instructing the jury regarding the law applicable to this case. Therefore, any such issue is waived. *See Logan v. Estate of Cannon*, 602 S.W.3d 363, 383 n.4 (Tenn. Ct. App. 2019) (issues not stated in a party's statement of the issues are waived); *see also* Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review.").

We conclude that the trial court did not abuse its discretion in denying the Hawk Parties' motion made pursuant to Rule 202.

### *iii.*

The Hawk Parties next argue that the trial court erred in again denying their motions made during the trial to admit the Tax Opinions. Following multiple arguments by counsel for the Hawk Parties that Chambliss had opened the door for them to use the Tax Opinions to impeach the testimony of Chambliss's witnesses, the trial court heard arguments outside the presence of the jury. Following this colloquy, the trial court held that the facts in the Tax Opinions were inadmissible pursuant to Rule 403 of the Tennessee Rules of Evidence. The trial court also noted that the unfair prejudice that would result by allowing the Hawk

Parties to cross-examine Chambliss's witnesses with the Tax Opinions could not be fixed with a curative instruction to the jury that the Tax Opinions were used for impeachment purposes only and not as substantive evidence. Thereafter, in its order denying the Hawk Parties' motion for a new trial, the trial court explained that allowing them "to rely on another court's opinion in [the underlying tax] case where professional negligence was not the issue to be tried would have little probative value and would be substantially outweighed by the danger of misleading the jury, and confusion of the issues." Despite this, the trial court continued to allow the Hawk Parties to discuss the ultimate outcome of the Tax Opinions so long as they did not discuss the findings of fact set forth therein.

Pursuant to Rule 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" Tenn. R. Evid. 403. The Hawk Parties sought to use the Tax Opinions to prove that Chambliss breached the duty it owed them. Importantly, however, that is not what the tax court decided. Instead, the issue before the tax court was "whether [the Hawk Parties] are liable as transferees under [Internal Revenue Code] section 6901 for Holiday Bowl's unpaid 2003 Federal income tax, penalty, and interest." *Hawk*, 2017 WL 5151379, at *1. Conversely, the issues to be decided by the jury in this case were whether Chambliss owed the Hawk Parties a duty of care, whether Chambliss breached that duty, and whether Chambliss's breach damaged the Hawk Parties. *See Jones*, 588 S.W.3d at 655. In addition to the risk that the jury may give undue weight to the tax court's opinions because they were rendered by a judge, there is a significant risk that the jury would confuse the issues if presented with the tax court's findings of fact. As such, the trial court did not abuse its discretion in denying the Hawk Parties' requests to cross-examine Chambliss's witnesses with the Tax Opinions.

### *iv.*

The Hawk Parties next argue that the trial court erred on numerous occasions when it allowed Chambliss's expert witnesses to testify as to various issues of law applicable in the underlying tax case but did not allow the Hawk Parties to impeach such testimony with the Tax Opinions. "Although the case law discussing the permissible scope of an expert's testimony in a legal malpractice action is sparse, the extant case law suggests that an expert is permitted to testify concerning the law applicable to the underlying action, at least to the extent necessary to explain the expert's conclusion concerning the attorney's standard of conduct." *Middle Mkt. Fin. Corp. v. D'Orazio*, No. 96CIV8138SWKHBP, 2002 WL 31108260, at *7 (S.D.N.Y. Sept. 23, 2002) (citing *Keller v. Albright*, 1 F.Supp.2d 1279 (D.Utah 1997); *Greene v. Payne, Wood & Littlejohn*, 602 N.Y.S.2d 883 (N.Y. App. Div. 1993)). "Whether an attorney exercised the appropriate standard of care in a particular case will almost always involve an inquiry into the substantive law governing the underlying claim." *Id.* at *8. "If an expert is precluded from testifying as to the law applicable to the underlying action, he will not be able to explain the rationale for his

opinion and the jury will be left with only the expert's naked conclusion with no basis for evaluating its validity or persuasiveness." *Id.*

It was necessary for the expert witnesses in this legal malpractice case to testify about the substantive law applicable to the tax case in order to explain the rationale for their opinions regarding whether Chambliss breached its duties to the Hawk Parties. Ultimately, however, "[t]he legitimacy of a jury's verdict is dependent on the accuracy of the trial court's instructions, which are the sole source of the legal principles required for the jury's deliberations." *Island Props. Assocs. v. Reaves Firm, Inc.*, 413 S.W.3d 392, 401 (Tenn. Ct. App. 2013). "Therefore, a trial court is under a duty to impart 'substantially accurate instructions concerning the law applicable to the matters at issue.'" *Id.* (quoting *Hensley v. CSX Transp., Inc.*, 310 S.W.3d 824, 833 (Tenn. Ct. App. 2009)). As discussed above, the Hawk Parties do not raise any issue on appeal regarding whether the trial court incorrectly instructed the jury as to the law applicable to this case.

The trial court did not err in prohibiting the Hawk Parties from using the Tax Opinions to cross-examine Chambliss's expert witnesses regarding the substantive law applicable to the tax case.

*v.*

The Hawk Parties also argue that the trial court erred in granting a motion in limine filed by Chambliss for judicial notice of various adjudicative facts relating to criminal indictments of certain MidCoast principals involved in the MidCoast transaction and the conviction of one of those principals. The trial court instructed the jury:

> In this case the Court has taken what is known as judicial notice of certain facts. The Court may take judicial notice of facts that cannot be the subject of reasonable dispute. These are the facts that the Court's taken judicial notice of: [1.[7]] The principals involved in several MidCoast transactions including the Holiday Bowl transaction were indicted attempted to [*sic*] defraud the United States government and obstruct the administration of tax law. [2.] John [Ivsan] the escrow agent in the Holiday Bowl MidCoast transaction was indicted as a co-conspirator that represented various entities that engaged in fraudulent tax transactions. [3.] MidCoast companies including MidCoast Credit Corp (phonetic) were to [*sic*] alleged to have been used by the co-conspirators to orchestrate a fraudulent scheme which evaded over 200 million in corporate income taxes and claims millions of dollars in fraudulent corporate tax refunds. [4.] Sequoia Capital, LLC, was formed in

---

[7] We number these facts as they were numbered in Chambliss's motion in limine to facilitate our discussion herein.

or about June 2003 and was alleged to have been used as a straw buyer for fraudulent MidCoast transactions. [5.] From in or about late 2003 to mid 2004 those two guys caused Sequoia to purchase the stock of 22 target corporations directly and indirectly from MidCoast Credit. [6.] The co-conspirators allegedly took various actions to conceal the true nature of the fraudulent transactions and the relationships of one of their co-conspirators and the entities from the IRS including from MidCoast Acquisitions staff. [7.] In later 2003 John [Ivsan] the escrow agent for the Holiday Bowl transactions was intentionally involved in and aware of the true nature of the fraudulent transactions. [8.] John [Ivsan] the escrow agent for the Holiday Bowl transaction pled guilty and was convicted on June 6th, 2017, in the United States District Court of the Eastern District of Pennsylvania to conspiracy to defraud the United States, tax evasion, and aiding and abetting. [9.] For his involvement in the fraudulent MidCoast transactions John [Ivsan] the escrow agent for the Holiday Bowl transaction was sentenced to six years in jail, was disbarred and was sentenced to more than 183 million in restitution. . . . You must accept these facts as proven.

These facts were drawn from a superseding indictment of various MidCoast principals filed in the United States District Court for the Eastern District of Pennsylvania, the sentencing memorandum of Ivsan, the docket sheet from Ivsan's criminal case, and a U.S. Tax Court order disbarring Ivsan. Chambliss also moved the trial court to take judicial notice of additional facts (numbered as facts ten through twelve in its motion in limine) that were drawn from opinions issued in unrelated tax court cases involving other victims of MidCoast's scheme; however, the trial court denied the motion with regard to these additional facts.

The Hawk Parties argue that the trial court erred in taking judicial notice of these facts because they do not fall within the scope of "adjudicative facts" anticipated by Rule 201, which provides for judicial notice of facts "not subject to reasonable dispute" that are "either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *See* Tenn. R. Evid. 201(b). Facts one through seven rely upon the superseding indictment of various MidCoast principals other than John Ivsan. That indictment notes that Ivsan was "a co-conspirator charged elsewhere[.]" The Hawk Parties argue that the purported facts within the indictment are not "beyond 'reasonable dispute' because many of the[] defendants [charged therein] have neither pleaded guilty nor been convicted." However, that is not the standard required by Rule 201. *See* Tenn. R. Evid. 201(b).

Facts one through six each clearly state either that the parties were indicted or that the fact was alleged. Either way, these are facts capable of accurate and ready

determination by resort to the superseding indictment, which is a source whose accuracy cannot reasonably be questioned. These are the type of facts anticipated by Rule 201. *See State v. Lawson*, 291 S.W.3d 864, 870 (Tenn. 2009) (noting with approval that "the federal courts have approved the taking of judicial notice of [] documents [filed in other cases] so long as the purpose was 'to establish the fact of such litigation and related filings,' rather than to establish the truth of the matters asserted in the other litigation").

We agree with the Hawk Parties that fact seven is not the type of "adjudicatory fact" anticipated by Rule 201. Whereas facts one through six are taken almost verbatim from the superseding indictment, fact seven is not. It is instead a conclusory statement drawn from fifteen paragraphs of the superseding indictment and a ten-page Memorandum in Aid of Sentencing filed by John Ivsan in his criminal case, none of which characterize Ivsan as having been "intensely involved" in the MidCoast transactions. Ultimately, however, we conclude that this error was harmless because it did not more probably than not affect the judgment and did not result in prejudice to the judicial process. *See* Tenn. R. App. P. 36(b). The Hawk Parties argue that the trial court "erred by judicially noticing the allegations rather than having the jury focus on the merits of [their] claims against Chambliss[,]" yet they do not argue that the trial court erred in taking judicial notice of facts eight and nine – that Ivsan was the escrow agent for the MidCoast transaction; that he pled guilty to and was convicted of conspiracy to defraud the United States, tax evasion, and aiding and abetting; and that he was sentenced to six years in jail, was disbarred, and was ordered to pay more than $183,000,000 in restitution. Moreover, the Hawk Parties' counsel, while cross-examining a witness, stated:

> Q. And the escrow agent designated by MidCoast and Sequoia turned out to be a crook, apparently.

> * * *

> Q. . . . The escrow agent – the escrow agreement – the whole thing was a sham because MidCoast and Sequoia were a bunch of crooks?

It is undisputed that the Hawk Parties fell victim to a criminal scheme perpetrated by MidCoast's principals, and facts eight and nine alone are enough to establish this. Given this context, we cannot conclude that the statement that Ivsan was "intensely involved" with these transactions more probably than not affected the judgment.

Finally, the Hawk Parties complain that, during a cross-examination of an expert witness for the Hawk Parties, counsel for Chambliss said: ". . . And in or around 2005, the IRS began tax shelter promoter penalty examination of MidCoast Acquisitions Corp and MidCoast Credit Corp. . . . Those facts I just read are all judicially noticed." Notably, this statement about when the IRS began its examination of MidCoast is fact ten from

Chambliss's motion, which the trial court declined to judicially notice.  However, the record reveals that the Hawk Parties did not contemporaneously object to this statement by counsel.  Accordingly, they have waived appellate review of this purported error.  *See* Tenn. R. App. P. 36(a) (providing that this Court need not grant relief to a party responsible for an error); *State v. Banks*, 271 S.W.3d 90, 170 (Tenn. 2008) ("Tennessee law is well-established that a party who invites or waives error, or who fails to take reasonable steps to cure an error, is not entitled to relief on appeal."); *Main Street Market, LLC v. Weinberg*, 432 S.W.3d 329, 337 n.4 (Tenn. Ct. App. 2013) ("It is well established [] that issues not raised at trial will not be considered for the first time on appeal.").

## B.

The Hawk Parties next argue that the jury's verdict should be set aside because it is not supported by material evidence.  This Court may set aside a jury's findings of fact in a civil action "only if there is *no* material evidence to support the verdict."  Tenn. R. App. P. 13(d) (emphasis added).  "This Court will not re-weigh the evidence, but will take the strongest view possible of the evidence in favor of the prevailing party, discarding evidence to the contrary and allowing all reasonable inferences to uphold the jury's verdict." *Watson v. Payne*, 359 S.W.3d 166, 168 (Tenn. Ct. App. 2011) (citing *Goodale v. Langenberg*, 243 S.W.3d 575, 583 (Tenn. Ct. App. 2007)).  "This standard of review safeguards the constitutional right to a trial by jury." *Childress v. Union Realty Co.*, 97 S.W.3d 573, 576 (Tenn. Ct. App. 2002) (citing *Miller v. Berry*, 457 S.W.2d 859, 862 (Tenn. Ct. App. 1970)).

Generally, "attorneys are not liable for mistaken opinion on a point of law that has not been settled by a court of highest jurisdiction, and on which reasonable attorneys may differ." *Schmidt v. Pearson, Evans & Chadwick*, 931 S.W.2d 774, 779 (Ark. 1996) (collecting cases).  The Hark Parties argue that the jury's verdict "is not supported by any material evidence because the applicable tax law at the time Chambliss gave its advice had been settled by the appropriate authorities[.]"  However, even one of the Hawk Parties' expert witnesses conceded that in 2003, when Chambliss gave the advice at issue in this case, the law was unsettled with regard to how transferee liability would be applied in a case such as this one.  Chambliss also put on three expert witnesses who opined that Chambliss's 2003 actions in advising the Hawk Parties did not amount to professional negligence.

As the trial court noted in its order denying the Hawk Parties' motion for new trial, "[t]his case came down to a battle of the experts."  Upon thorough review of the substantial record in this case, we find material evidence to support the jury verdict.  Therefore, we cannot set it aside.

- 17 -

*C.*

Finally, Chambliss appeals the trial court's denial of its motions for summary judgment. The trial court denied these motions after finding that a genuine issue of material fact existed as to when the Hawk Parties discovered that they had suffered an actual injury so as to trigger the one-year statute of limitations. The question of whether the Hawk Parties' statute of limitations had run prior to the filing of their suit was submitted to the jury, which found that the Hawk Parties' legal malpractice suit was timely filed.

This issue is not reviewable on appeal. "When the trial court's denial of a motion for summary judgment is predicated upon the existence of a genuine issue as to a material fact, the overruling of that motion is not reviewable on appeal when subsequently there has been a judgment rendered after a trial on the merits." *Beard v. Branson*, 528 S.W.3d 487, 494 n.12 (Tenn. 2017) (citing *Hobson v. First State Bank*, 777 S.W.2d 24, 32 (Tenn. Ct. App. 1989); *In re Est. of Blackburn*, 253 S.W.3d 603, 611 (Tenn. Ct. App. 2007)). As this Court has explained,

> to allow such review would not provide proper respect for the judicial process. Unlike a summary judgment, a matter that is decided at trial has been through the true test of the adversarial process where witnesses are presented, cross-examined, and subjected to the credibility assessment of the court or jury. Each party has had the most complete hearing it can have. No good reason exists to disregard that process and substitute our judgment based on facts presented via affidavits, pleadings, and discovery documents at an earlier point in the litigation.

*Alex Lyon & Son Sales Managers and Auctioneers, Inc. v. Boles*, No. M2010-00388-COA-R3-CV, 2010 WL 3895520, at *2 (Tenn. Ct. App. Oct. 5, 2010). The trial court determined twice that a genuine issue of material fact existed and denied Chambliss's motions for summary judgment. We cannot now disturb that determination.

**CONCLUSION**

For all of these reasons, we affirm the judgment of the Circuit Court for Hamilton County. Costs of this appeal are taxed jointly and severally to the appellants, Billy F. Hawk, Jr. GST Non-Exempt Marital Trust; Nancy Sue Hawk; Billy F. Hawk, Jr. GST Exempt Marital Trust; and the Estate of Billy F. Hawk, Jr., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE